**RADIO CORPORATION OF AMERICA,**
**Plaintiff,**

v.

**PHILCO CORPORATION, Defendant.**

**Civ. A. No. 25408.**

United States District Court
E. D. Pennsylvania.

Nov. 24, 1961.

See also 187 F.Supp. 940.

Edward W. Mullinix, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., and Stephen H. Philbin, John Farley, New York City, and A. Russinoff, Princeton, N. J., for plaintiff.

Thomas M. Ferrill, Jr., Allen V. Hazeltine, and Dexter N. Shaw, Philadelphia, Pa., for defendant.

LEAHY, Senior District Judge.

This action was brought[1] to review[2] a decision[3] of the Board of Patent Interferences in an interference proceeding between two rival inventors, Moore and Sziklai, and their respective assignees, Philco Corporation and the Radio Corporation of America.

The interference resulting in this action was preceded by another interference, No. 86,967, declared on May 4, 1954 and based on a Moore (Philco) patent, No. 2,644,030, and a Luck (RCA) application.[4] Subsequently, Philco proposed a new interference substituting the Moore application, filed January 11, 1952.[5] RCA moved to substitute the Sziklai application filed June 22, 1950, here involved, for its Luck application.[6] The RCA motion was opposed by Philco on the ground that the Sziklai application did not have the "each having" chromaticity feature of the count. Philco did not raise the contention [later raised before the Board of Patent Interferences] that the Sziklai application did not have the "monochromatic" feature of the count. The Examiner held against Philco on September 21, 1955, and denied a petition for reconsideration on October 19, 1955.[7] On January 25, 1956, Interference No. 87,816 (the subject of the present suit here) was declared.[8] In its decision of May 22, 1958 the Board of Patent Interferences accepted Philco's contention that the Sziklai application did not disclose the "each having" feature of the count and accordingly decided that Moore was prior. The Board refused to consider Philco's contention that the Sziklai application did not have the "monochromatic" feature of the count because "it was not raised by Moore in his opposition to the motion to substitute in Interference No. 86,967 and no good and sufficient reason for failing to do so has been presented."[9] The Board further held that, on the evidence, if the Sziklai application disclosed the count, Sziklai was prior, since Moore had failed to prove diligence.

On July 24, 1958 the Board denied the Sziklai (RCA) petition for reconsideration.[10] A notice of appeal was filed in the Court of Customs and Patent Appeals by Sziklai on August 22, 1958.[11] On September 8, 1958 Moore elected under 35 U.S.C. §§ 141 and 146 to proceed in a District Court.[12] On October 8, 1958 RCA filed its complaint in this Court; and the RCA appeal, then pending, was dismissed by the Court of Customs and Patent Appeals on October 10, 1958.[13]

1. Pursuant to 35 U.S.C. § 141.

2. Under 35 U.S.C. § 146.

3. Decision of the Board of Patent Interferences, dated May 23, 1958. PX. 1–15.

4. Notice of Declaration of Interference No. 86,967, Luck v. Moore, dated May 9, 1954. PX. 1–3.

5. Moore Motion (B) to Declare a New Interference in Interference No. 86,967, filed January 26, 1955. PX. 1–4.

6. Radio Corporation of America Motion (2) to Substitute the Sziklai Application, filed March 19, 1955. PX. 1–5.

7. Examiner's decision on Motions in Interference No. 86,967 dated September 21, 1955, granting motion to substitute. PX. 1–6.

8. Notice of Declaration of Interference No. 87,816, Moore v. Sziklai, dated January 25, 1956. PX. 1–12.

9. Decision of Board of Patent Interferences. PX. 1–15, pp. 7, 8.

10. Decision of the Board of Patent Interferences on Petition for Reconsideration, dated July 24, 1958. PX. 1–16.

11. Sziklai's Notice of Appeal to the United States Court of Customs and Patent Appeals, filed August 22, 1958. PX. 1–17.

12. Moore's Notice, filed September 8, 1958, Electing to Have Proceedings Conducted in U. S. District Court. PX. 1–18.

13. Order of Court of Customs and Patent Appeals, dated October 10, 1958, dismissing Sziklai appeal because of Moore's election to proceed under 35 U.S.C. § 146. PX. 1–19.

The interference count is a claim in the Moore application.[14] It is:

"A color television system comprising: means for producing a signal representative of variations in monochromatic intelligence of successively scanned portions of a televised scene; means for producing a plurality of signals respectively representative of different chromaticity components of said successively scanned portions; a source of a plurality of alternating signals of a single equal frequency and mutually different phases; means for utilizing different ones of said chromaticity representative signals to modulate different ones of said alternating signals to produce signals, each having fixed average value and each having a single, alternating component whose excursions on both sides of its respective fixed average value are substantially equally affected by variations in its respective chromaticity representative signal; and means for additively combining said signal representative of monochromatic intelligence and said produced alternating signals for transmission to a receiver."

### The Count in Controversy

The count discloses a color television transmitter designed to produce "compatible" color television signals suitable for utilization in colored television receivers and standard monochrome (black and white) television receivers. The inventive feature of the count is embodied in the use of a sine wave modulator to produce a signal containing the desired chromatic intelligence. Prior transmission systems used pulse samplers to fulfill this role. The invention is claimed to provide many advances over prior pulse sampling techniques, viz: the elimination of sampling intervals which caused noticeable dot patterns in the reproduced television image.[15] More important, however, modulation is far simpler than pulse sampling.[16] For example, modulation, unlike pulse sampling, does not require the use of highly elaborate and sophisticated filters to eliminate many undesired frequency components generated in the production of the chromatic component of the transmission signal.[17] This advantage is set forth by

14. Application of Robert C. Moore. Claim 1.

15. Application of Robert C. Moore, No. 265981: statement of purpose; Application of George C. Sziklai, No. 169594: statement of purpose.

16. Tr. 154–155; Application of George C. Sziklai, p. 4; Application of Robert C. Moore, p. 6.

17. The object of a compatible television transmitter is to produce a signal which contains a monochromatic component which is suitable for utilization in a monochromatic (black and white) receiver and a chromatic component which, along with the monochromatic component, may be utilized in a colored television receiver. A typical pulse sampler television translated system utilizes three cameras: red, green, and blue. The camera output of each camera contains both monochromatic and chromatic intelligence, both of which occupy a low frequency range. In order to separate the two components, to translate them into a transmittable "compatible" signal, the chromaticity intelligence is transmitted to a higher frequency range. This is then subjected to the sampling process which produces a series of currents in the form of short positive pulses. These pulses are samples taken in cyclically recurrent succession of the individual signals of the camera outputs.

As a result of the sampling process, the pulses contain many undesired frequency components, some of which are at the original low frequencies and therefore lie within the range of the monochromatic component of the signal. To prevent contamination of the latter, when the final transmission signal is formed, as well as to eliminate an unnecessary increase in the total range of the transmitted signal, these undesired frequency components must be eliminated. This requires the use of highly elaborate and sophisticated filters.

The use of a modulator instead of a pulse sampler eliminates the need for these filters. Modulation may take place at a low frequency and the original color components are practically cancelled or eliminated in the modulation process,

Moore [18] and prompted the Sziklai invention to be described by the count.[19]

In general, the principle the Moore and Sziklai devices disclosed are identical. Both adopt the concept of using modulation to produce a transmittable color component. Both adopt the concept of by-passing the monochromatic current and combining it with the modulated color current to produce the completed transmission signal. Only their mechanical parts differ. Both similarities and differences may best be understood by reference to the interference count.

The first element of the count, "*A color television system comprising,*" serves to designate the general area of invention. It is applicable to both Moore and Sziklai.

The count continues: "*means for producing a signal representative of variation in monochromatic intelligence of successively scanned portions of a televised scene;*". A monochrome (black and white) component is formed by adding together the three primary colors (red, green, and blue) and the televised scene. Moore claims the Sziklai device does not have such means. In the Moore device, he explains, this is accomplished by three lines, one running from each of the three (red, green, and blue) camera outputs to an adder where they are combined to make the composite monochromatic component.[20] This component is then filtered through an 0–3 megacycle low pass filter

and carried to a second adder where it is combined with the modulated color currents to form the composite transmission signal. As to Sziklai, his device eliminates the first adder. Three lines, one from each camera output, lead to a combining circuit (which performs essentially the same function as an adder) where the composite transmission signal is formed.[21] It is Moore's contention the Sziklai application does not disclose means to produce a distinct monochromatic signal before the monochromatic information is combined into the composite transmission signal, and, that *such a means is required by the count.*

The count reads further: "means for producing a plurality of signals respectively representative of different chromaticity components of said successively scanned portions;". This portion of the count describes three color cameras, red, green and blue, used in both the Moore and Sziklai mechanisms.[22] In both devices each of the three camera outputs is passed through a low pass filter [the value of Moore's filter is 0–0.5 MC; the value of Sziklai's filter is 0–2 MC] before entering the modulation stage of the transmission operation. Neither the cameras nor the filters following the camera outputs are either important or relevant to the issues for decision in this case.

The next element of the count reads: "a source of a plurality of alternating signals of a single equal frequency and

rather than passed through as is the case in a pulse sampling system.

18. Application of Robert C. Moore, p. 8.

19. Sziklai testified before the Patent Interference Examiner:

"Q. 31. * * * You have described the sort of equipment that was used in such color television work prior to the making of your invention. Can you tell us what it was that prompted you to make your invention? A. Well, in the system I have just described before, I said it was the requirement of providing a large number of filters, comparatively large number of filters. And these filters had to be very good because under

recombining of the signals they had to match—there was a cutoff, a frequency separation right in the middle of the band. Now, while this could be accomplished, it was not exactly an economical thing to do.

What I have tried to do was to eliminate this band separation in the middle of the band to be transmitted. And, therefore, I recognized that if I am going to separate the color information from the brightness information that this filtering of the by-passed mixed highs becomes unnecessary."

20. Tr. 163–164.

21. Tr. 71.

22. Tr. 72, 164.

mutually different phases;". In the Moore device the source is contained in a subcarrier source which generates a 3.5 megacycle alternating signal.[23] This signal is fed into a delay line which, by adjusting the phases (time sequence between the sine-wave of the signal) produces three alternating signals having mutually different phases, all at a frequency of 3.5 MC. Each signal is carried by a separate line to one of three modulators where it is modulated to carry the color information of one of the camera outputs. Sziklai provides a 3.6 megacycle oscillator as the source described.[24] The oscillator (like a subcarrier source) produces an alternating signal at 3.6 megacycles. This signal, after being tapped by a lead to one modulator, is put through to a 120° phase shifter. After being tapped by a lead to a second modulator, it is fed through a second 120° phase shifter, to a third modulator. The phase shifters produce the same effect as the delay line in the Moore device. It appears both mechanisms, therefore, contain this element of the count.

Continuing, the count reads: "means for utilizing different ones of said chromaticity representative signals to modulate different ones of said alternating signals to produce signals, each having fixed average value and each having a single, alternating component whose excursions on both sides of its respective fixed average value are substantially equally affected by variations in its respective chromaticity representative signal." This portion of the count describes the modulation operation and the resulting signal. Moore contends Sziklai's device does not disclose this facet of the invention. Sziklai contends it does. The object of the modulation stage in both Moore and Sziklai is to produce modulations of the subcarrier currents so that they reflect the variations of the respective color currents but are free of such color currents, e. g., having characteristics described by the "each having" part of this portion of the count. Moore produces such currents by the use of doubly-balanced modulators.[25] Sziklai produces such currents by the use of singly-balanced modulators followed by band-pass filters.[26] Each device contains three modulator circuits, for each of the three color components. The doubly-balanced modulator disclosed by Moore has two inputs; one the video or color signal, the other the 3.5 MC subcarrier current. Before entering the modulator each is passed through a separate phase inverter where it is split into two signals of opposite polarity. Thus, for example, by passing the color signal through a phase inverter, two signals are produced, one of which has the negative voltage correlative of the other which has a positive voltage. Each is then applied to a control grid of one of the two tubes of the modulator. Being out of phase they do opposite things to the electron beam occurring in the two separate tubes. As a result, they cancel or balance each other out at the modulator output. Both the color input and the subcarrier input are balanced in this fashion by the Moore modulator and hence are not present in the modulator's output.[27] The resulting output current of the modulator, therefore, conforms to the "each having" specifications of the count.[28]

Whereas Moore provides for a doubly-balanced modulator, Sziklai uses a singly-balanced modulator which is balanced only for the subcarrier current.[29] Sziklai does not balance out the color signal.[30] As a result, the modulator output current in the Sziklai device contains the original color signals and consequently does not have a fixed average value prescribed by the "each having" portion of the count.[31] To remove the color signals from the

23. Tr. 164.
24. Tr. 72.
25. Tr. 164–171.
26. Tr. 73–74.
27. Tr. 232–235.

28. Tr. 167–171.
29. Tr. 77–78, 98.
30. Tr. 74, 77–78.
31. Tr. 79.

modulated current Sziklai relies upon a 2–4 megacycle band pass filter which, in his device, follows the modulator output tap.[32] After passing through this filter the modulated current has a fixed average value and conforms to the requirements of the count.

To conform to Sziklai's specifications the 2–4 megacycle filter must be able to discriminate between an 0–2 megacycle current (the frequency range of the color output signal) and a 2–4 megacycle current (the frequency range of the desired modulated current).[33] This requires a particularly sophisticated filter.[34] As Sziklai stated:

"Q. 32. In describing your earlier concept that you can phase detect, the composite signal, I believe you made a statement which says that this can save filters. Did you have reference to this phase detection apparatus? A. Well, the phase detection apparatus is normally a balanced modulator, or it can be an unbalanced modulator, but in this case you have to apply filters to balance out some of the components.

*"Now, this is particularly difficult if the filter has to take out compo-*

*nents which are very close in frequency relation to the desired components. This can become either particularly difficult or sometimes next to impossible."* [35] (Emphasis added).

Indeed, it appears questionable whether any filter could be constructed which would eliminate possible vestiges of the 0–2 megacycle color current since these vestiges would overlap with the frequency of the desired modulated current.[36]

Moore argues that the wording of the count "means—to modulate—to produce" requires the modulated signals characterized by the "each having" portion of the count to be produced solely by modulation, i. e., by a modulator.[37] Because Sziklai must use a filter to produce the specified currents, his device, Moore further contends, will not support this position of the count. On the other hand, Sziklai's position is that "means—to modulate—to produce" is inclusive of any method used to free the modulated currents of the original color signals, including filtering; hence, his invention does support the count.[38]

32. Tr. 74.

33. Tr. 87–88.

34. Tr. 161–164.

35. Record on behalf of George C. Sziklai before the Patent Examiner in Interference No. 87,816, p. 26.
 Plaintiff's Wentworth, at the trial, also testified:
 " * * * The filtering approach becomes increasingly difficult as you approach and overlap, as the band of original frequencies comes closer to the band of desired band frequencies." (Tr. 110). and further:
 "Q. Well, now, going back to filters, I would assume (and correct me if I am wrong) that it will take pretty good filters to bring you out to that characteristic similar to the one that I read from a portion of the test of the interference count? A. Yes, it is fair to say that it would take rather good filters, yes." (Tr. 113).

36. In fact, plaintiff's Wentworth testified at trial:
 "In actual engineering practice there is no such thing as a filter that has 100 per cent response over a 0–2 megacycle range and then suddenly chops off and has nothing beyond that.
 "In actual practice, all such filters have a finite slope in their characteristics and at various times the two megacycle nominal figure may refer to the shoulder of the curve, at which point it starts decreasing the response to the various frequencies. In other contexts it would mean the bottom of the characteristics." (Tr. 80–81).
 It is not clear what reference point Sziklai adopts. However, Wentworth testified:
 " * * * in this application, it is apparent to anyone skilled in the art, reading this kind of diagram, that the objective of the filters is to prevent an overlap." (Tr. 103).

37. Defendant's Reply Brief, p. 5.

38. Brief for Plaintiff, p. 17.

In support of Sziklai's position it was shown at trial that, although not disclosed in the Moore application, in actual practice Philco [Moore] used an adjustable low-pass/high-pass filter following the modulator output. Joseph Frederick Fisher, a Philco engineer, had testified before the Patent Examiner that these filters were necessary.

"XQ.150. * * * Now, if your balanced modulator on Exhibit 9 were properly balanced both as to video signal and subcarrier reference signal—theoretically, these filters would not be necessary, isn't that correct? * * * A. No, because in that case the chrominance band width and amount of high frequency energy in the side bands of the chrominance signal was determined by filtering ahead of the modulator and also by filtering after the modulator. So, to get the right amount of chrominance energy we depended on both the filters to do this job."[39]

The primary function of filtering after the balanced modulator (as Fisher's testimony would indicate) is to trim the band-width of the modulated signal. Apart from cleaning up small remnant signals which might be produced by minor imbalances in the modulator, the filter does not provide a substitute, as in the case of Sziklai's device, to the balancing out of the color signals by the modulator.[40] In fact, the modulator circuits have been operated without filters following the modulators.[41] Because Moore's filters do not play an essential role in the production of a color free modulated current, their use in his device, he argues, does not give credence to Sziklai's position.

The count then continues: "and means for additively combining said signal rep-resentative of monochromatic intelligence and said produced alternating signals for transmission to a receiver." This is accomplished in the Moore device by an adder which has, as its inputs, the three modulated currents and the combined monochromatic current.[42] Sziklai produces the composite transmission signal by combining the three modulated signals and the three monochromatic signals in a combining circuit whose output is the composite transmission signal.[43] It is not clear from Sziklai's disclosure whether the three monochromatic signals are formed into a composite monochromatic signal inside the circuit before being combined with the three modulated signals. Wentworth, plaintiff RCA's expert, testified that one skilled in the art would assume that a composite monochromatic signal is formed.[44] Philco [Moore] challenges this interpretation.

## I. Monochromatic Feature of the Count

Moore urged before the Board of Patent Interferences that the Sziklai disclosure does not support the "monochromatic" limitation of the count. This contention was not made before the Primary Examiner. The Board, in refusing to consider this point, held:

"This contention is not entitled to consideration here since it was not raised by Moore in his opposition to the motion to substitute in Interference No. 86,967 and no good and sufficient reason for failing to do so has been presented. Anderson v. Walsh [Walch, 152 F.2d 975], 33 CCPA 774; 68 USPQ 382; 1946 C.D. 112; and Creed et al v. Potts [96 F.2d 317] 25 CCPA 1084; 37 USPQ 512; 1938 C.D. 498."[45]

A preliminary issue may be decided at the outset. It is whether Moore may

39. Vol. 1, Record on Behalf of Robert C. Moore Before the Patent Interference Examiner, pp. 247–248.

40. Tr. 238–240.

41. Tr. 238.

42. Tr. 172.

43. Tr. 74–75.

44. Tr. 114–116.

45. Decision of Board of Patent Interferences. PX. 1–15, pp. 7–8.

now contend that the Sziklai application does not disclose the "monochromatic" feature ["means for producing a signal representative of variations in monochromatic intelligence of successively scanned portions of a televised scene"]; and, if so, whether the contention is correct. Moore's contention is reiterated here. He asserts that, because a § 146 action such as this is a trial de novo, he is not limited to those contentions considered by the Patent Office, but, on the contrary, he is entitled to have the Court consider all questions which he may raise with respect to the interference subject matter.

■■ Although the proceeding here is conducted as a trial de novo rather than an appeal, it is essentially a review of an administrative proceeding; in this instance a review of an adverse decision of the Board of Patent Interferences.[45a] Turchan v. Bailey Meter Co., D.C.Del., 19 F.R.D. 201. An orderly policy of judicial administration dictates that a party in any adversary proceeding, including an interference, should not be permitted to circumvent initial stages in the prosecution of his cause by raising totally new issues at the review or appellate levels; otherwise a party might too easily ambush his opponent and, in this case, the Patent Office itself, after lengthy administrative proceedings. Courts should not be deprived of any assistance which might be gained from the expertise of the quasi-administrative agency, i. e., the Patent Office.

■ Moore failed to raise this issue before the Primary Examiner, yet had adequate opportunity to do so. Rules 1.231[46] and 1.232[47] of the Rules of Practice of the Patent Office, 35 U.S.C.A. Appendix specifically designate when such a contention may be put in issue. These rules have the force of law in this proceeding, and Moore should be bound by them. Sperry Rand Corp. v. Bell Telephone Laboratories, Inc., S.D.N.Y., 171 F.Supp. 343. Accordingly, the Board acted correctly in refusing to consider it.[48]

Two remaining issues are before the Court for decision:

(a) Whether the Sziklai application discloses the "each having" clause of the count ["means for utilizing different ones of said chromaticity representative signals to modulate different ones of said alternating signals to produce signals, each having fixed average value and each having a single, alternating component whose excursions on both sides of its respective fixed average value are substantially equally affected by variations in its respective chromaticity representative signals"]; and

(b) If the Sziklai application does support the count, whether Moore proved conception before Sziklai and was diligent in reducing his conception to practice.

---

45a. The case here is a sequential step in an entire process initiated to obtain a patent. In this sense, a § 146 action is an extension of the Patent Office proceedings.

46. 37 CFR § 1.231. Motion Period:
"After the preliminary statements have been received and approved, or the time for filing them has expired, a period will be fixed within which the various motions specified in §§ 1.232 to 1.236 may be brought by the parties. The period, not less than thirty days, will be fixed by an examiner of interferences in the notice referred to in § 1.226. In the case of a junior party under order to show cause (§ 1.225) the period specified for answer to the order is the motion period and such motions may be brought as constitute an answer to the order."

47. Ibid. "§ 1.232. Motions to dissolve:
"(a) Motions to dissolve an interference may be brought on the ground * * *
"(3) that a particular party has no right to make the claim, * * *."

48. Shell Development Co. v. Pure Oil Co., D.C.D.C., 111 F.Supp. 197, 199 ("New evidence may be received which strengthens contentions already fully made and supported by testimony before the Patent Office * * *"), reiterated in Sperry Rand Corp. v. Bell Telephone Laboratories, Inc., S.D.N.Y., 171 F.Supp. 343, 347.

## II. Disclosure

Moore contends that Sziklai does not disclose the "each having" feature of the count. The Primary Examiner ruled against Moore. He wrote:

"Philco argues first that Sziklai shows a filter following the balanced modulator and therefore cannot make the counts. Referring to count F (which is set forth as being typical of a first group of the proposed counts) it is noted that the 'modulator' in question is recited as a 'means'. To perform the function or result attributed to this 'means' does not require a specific structure and would be readable on the combined modulator and filter of Sziklai if desired."[49]

\* \* \* \* \* \*

"In view of the common knowledge of the analogy between modulators and demodulators and the knowledge of the operation of balanced modulators considerably prior to the filing of any of the involved application, it is considered that the statements pointed out in the Sziklai's specifications by Philco[50] are adequate disclosure to support the terms of Count F."[51]

The Board of Patent Interferences, reversing the Primary Examiner, stated:

"It is our opinion, however, that the Primary Examiner in his decision and Sziklai in his brief give insufficient weight to the language in the count, '\* \* \* to modulate \* \* \* to produce signals \* \* \*.' We think that the successive use of these infinitive phrases of function must be given the meaning that the first named operation results in the production of the particular signal recited in the count. The modulating means may, of course, be any modulating circuit which will accomplish that result. Modulating and filtering are distinct and independent terms in the electronic art, and to say that the expression 'modulating to produce' is inclusive of modulating and filtering to produce is entirely unjustified in our opinion.

"We will next examine the Sziklai disclosure to determine whether or not it discloses a modulating means which produces a signal of the nature required by the count. As is apparent from the portion of the Sziklai specification reproduced above, the only mention of modulating means in the description of Figure 3 is the reference to 'balanced modulator type circuits 152, 154 and 160.'

"We think it undisputed that at the time of filing of the Sziklai application various types of balanced modulator circuits were well known in the art, some of which would suppress or eliminate a selected one of the two input signals which characterize a modulator circuit, and others of which would suppress both input signals as such, leaving in the output only side bands, i. e., frequencies which are the sum or difference of the frequencies of the two input signals. See Chapter 11 of the treatise on Waveforms, Volume 19 of the Massachusetts Institute of Technology, Radiation Laboratory Series, 1949, McGraw-Hill Book Co. Thus it seems clear that whether or not the low frequency video modulating signal would be eliminated by a particular balanced modulator circuit would depend upon the particular

49. Examiner's Decision on Motion in Interference No. 86,967. PX. 1–6, p. 21.

50. E. g., George C. Sziklai: Application for Letters Patent for Improvements in Multiplex Systems, p. 9:
"However the signal comparing or phase detecting circuit to be used in the present invention will provide an output corresponding only to the fourth term of the right-hand side of the above equation and will suppress by means of balance and/or filters the remaining terms of the right-hand side of the above equation."

51. Examiner's Decision on Motion in Interference No. 86,967, supra, p. 22.

circuit selected, and if that circuit were of the type which would eliminate only one of the input signals, it would depend upon the connection of the modulator to the sources of input signals. This is, in effect, stated by Sziklai in his brief, the first sentence at the top of page (6) as follows:

" 'A balanced modulator is one conventional apparatus element which is usable for such purpose, so long as it is balanced at least for the chromaticity representative signal by which an alternating (i. e., subcarrier) wave is modulated.'

"It therefore cannot be said that the Sziklai application discloses the count in issue unless some teaching can be found therein as to specific circuitry which will inherently balance out the undesired signal or to the effect that his signal should be removed by the modulating circuit. It is not enough that certain known types of balanced modulators would perform the recited function when other equally well known types would not necessarily do so. As was stated by the Court of Customs and Patent Appeals in the case of Brand v. Thomas [96 F.2d 301], 25 CCPA 1053; 37 USPQ 505; 1938 C.D. 467; cited by Moore:

" 'Lack of clear disclosure is not supplied by a speculation as to what one skilled in the art might do or might not do if he followed the teaching of the inventor.'

"We find nothing in the Sziklai application which would teach one to select the type of balanced modulator which would perform as required by the count." [52]

Sziklai, here, attacks the Board's decision because it is not in accordance with well settled rules of construction. He argues the law of patent interferences requires that counts of an interference should be given the broadest interpretation which they will reasonably support, and a party who states his claims broadly to the Patent Office should not be permitted, in an ensuing interference, to read limitations into them. Moore, he continues, has attempted to read the limitation of balanced circuits into the "means * * * to modulate * * * to produce signals" clause of the count. Because, he concludes, the board in its decision accepted Moore's position, it was in error and should therefore be overruled.

This argument misconstrues Moore's position and the theory of the Board's decision. Moore does not maintain that the count requires the use of balanced circuits. His position is that the count, read broadly, requires that the original color signals be suppressed by modulation so that the modulator output current is free from their presence. He states that any type of modulating circuit, balanced or unbalanced, may be used if it will produce this result.[53] Likewise, the Board, in its decision, specifically states: "The modulating means may, of course, be any modulating circuit which will accomplish that result." [54]

The evidence before the court indicates that the requirements of the count, as stated by Moore, may be met by the use of any modulator which is balanced at least for the chromaticity representative signal.[55] There is no evidence that an unbalanced modulator circuit could not be adapted to perform the same function. Even assuming, however, as a practical matter only a balanced modulator circuit might be used, the meaning of the count would still not thereby constrict so as to apply only to balanced circuits. As both parties agree that disclosure in this case will be determined by the interpretation which is placed upon the "means—to modulate—to produce signals" portion of the count, the issue is one of semantics.

52. Decision of Board of Patent Interferences. PX. 1–15, pp. 5, 6.

53. Defendant's Reply Brief, p. 5.

54. Decision of the Board supra p. 5.

55. Tr. 158.

■ Generally, questions of patent phraseology should be determined by reference to the technical idiom of the art to which the patent belongs. It is the purpose of expert testimony to supply the Court with the technical knowledge necessary for such a determination. However, in this case, because of the lack of analytic specificity, discussed infra, the expert testimony was not as helpful as might have been hoped.

At trial, F. J. Bingley, expert witness for Moore, testified that the phrase "means—to modulate—to produce" denotes any modulator circuit which produces signals which have the "each having" characteristic specified in the subsequent portions of the count.[56] Sziklai concedes this, but adds that the denotation of the phrase may also include any modulator circuit to produce the required signals.[57] It is possible via semantic mechanisms to support Sziklai's interpretation by either a syntactical analysis of the entire phrase "modulate to produce" or by a referential assumption for the words. Thus, it may be concluded from its syntax that the phrase "modulate to produce" referentially encompasses any electrical configuration so long as one of its components is a modulator. Also one may maintain, as does Bedford,[58] that the filtering circuit is a part of the modulator circuit within the meaning of "modulate" rather than a separate device. Several experts testified for Sziklai at trial and before the Primary Examiner. All supported his interpretation.[59] However, with the exception of Bedford, their testimony does not reveal the specific grounds for their support, i. e., whether their interpretation is based upon a syntactical analysis or technical understanding of the meaning of "modulate to produce." Sziklai's stated position: "Plain-

tiff's position is that 'to modulate * * to produce' does not require balance modulating, to produce, but is inclusive of any method, after the modulated signals have been produced, including filtering and balancing, to free the modulated currents from the color currents.",[60] does not resolve this uncertainty. Neither is the testimony of Moore's experts of any assistance because none were asked to interpret the count in relation to the Sziklai device. Although Bingley testified to the difficulty of removing the color signals by filtering,[61] such testimony was not focused upon the referential meaning of the count. Upon an analytical examination of both approaches, however, it is apparent that Sziklai's interpretation cannot be adopted.

a) Syntax of the phrase:

■ Absent evidence that special grammatical constructions are employed in the art, questions of patent interpretation which arise from the particular arrangement of word components within a phrase, should be determined on the basis of common grammatical usage. Such questions do not lie within the special expertise of one skilled in the art. The Board, interpreting the phrase, "to modulate * * * to produce" stated:

> "The successive use of these infinitive phrases of function must be given the meaning that the first named operation results in the next succeeding function. That is, the modulation must result in the production of the particular signal recited in the count." [62]

Common grammatical usage supports this construction. Adoption of the Sziklai construction would require the injection of unwarranted referential ambiguity into the clear meaning of a preposition.

56. Tr. 155.

57. Brief for Plaintiff, p. 17.

58. Record on Behalf of George C. Sziklai Before the Primary Examiner, No. 87,-816, pp. 227–228.

59. Alfred C. Schroeder and Alda V. Bedford testified before the Primary Exam-

iner; John W. Wentworth testified at trial.

60. Footnote 57, supra.

61. Tr. p. 155 and pp. 238–240.

62. Decision of Board of Patent Interferences. PX. 1–15, p. 5.

### b) The referential meaning of modulator:

The referential meaning of "modulator" must be determined by reference to the use of the word in the electrical art. On this point, the Board ruled that:

"Modulating and filtering are distinct and independent terms in the electronic art and to say that the expression, 'modulating to produce' is inclusive of modulating and filtering to produce is entirely unjustified in our opinion." [63]

This is supported by the testimony of the experts. Modulation is a process which multiplies the values of certain input signals to produce a wave having values proportional to the product of the input signals.[64] This process may be used as a valuable technique for eliminating unwanted signals whose frequencies lie near or overlap the frequency band of a desired signal.[65] Such cancellation is accomplished by balancing out the input signal; that is, by splitting the input signal into negative and positive values which simultaneously cancel each other out in the modulator output. Unbalanced modulators do not perform this cancellation function. Thus, for example, a pulse sampler, a form of unbalanced modulator[66] used in the prior art, passes through all of the unwanted color signal although it performs the multiplication function.

Filtering is a method of eliminating certain frequency components from a signal by the use of a tuned electrical circuit which is responsive to some frequency components, permitting them to pass through, but not to others, which are rejected. In this sense a filter is an electrical screen.[67] It is easier to remove unwanted frequency components by filtering when they are widely separated from the frequencies of the desired current. Filtering becomes increasingly difficult as the unwanted frequencies approach that of the desired frequency.[68] If the unwanted frequencies overlap those of the desired signal, their removal by filtering is impossible.[69]

It is apparent modulating is different from filtering in two respects. First, modulating serves as a means of combining currents; filtering does not. Second, where modulating is used as a technique for eliminating unwanted frequencies, it does so by cancelling or "bucking" them out; filtering screens or sifts them out.

Sziklai, it would appear, concedes, as the Board states, that modulators and filters are different. His brief states:

"Of course, modulation and filtering are different—no one contends otherwise, * * *".[70]

However, the same sentence continues:

"* * * but balancing is just as different. Modulation and balancing are each different functions, performed by different devices, which apparently was not appreciated by the Board." [71]

It is true, as pointed out, a balanced modulator is different from an unbalanced modulator in the sense that the former will cancel certain frequency components and the latter will not. It is apparently Sziklai's position that because the count specifies a modulator rather than a balanced modulator, it may refer to an unbalanced modulator. In order to include an unbalanced modulator it must impliedly refer to a filtering system as part of that modulator, otherwise the specified currents would not be produced. Therefore, according to Sziklai, the Board's view that a filter is a separate device,

---

63. Ibid.

64. Record on Behalf of George C. Sziklai Before the Primary Examiner, No. 87,-816, p. 202.

65. Tr. 161.

66. Record on Behalf of Sziklai, p. 227.

67. Tr. 39.

68. Tr. 161; Record on Behalf of Sziklai, p. 26.

69. See Footnote 35 supra.

70. Brief for Plaintiff, p. 17.

71. Ibid.

while correct, does not apply to the word "modulate" as it is used in his count.

But, this argument is circular. One question before the Court is whether "modulate" should be interpreted broadly. In effect, Sziklai maintains that the word "modulate" should be read broadly to include a filtering system because otherwise it would not be given the broad referential scope which, in the context of the count, it is intended to have. Yet, weak as the argument is, on its face, it has some expert support. Alda V. Bedford, an expert, testified before the Patent Examiner as follows:

> "XQ. 132. Well, then, I understand from what you last said that the impedances do not have to be included in the balanced modulator circuit itself. A. No, I said quite the contrary, if I understand you correctly now. The impedances are a part of the balanced modulator because without them it would not— might not be balanced. They are a part of the device for removing the unwanted components that an otherwise unbalanced modulator might produce." [72]

But both Bedford and Sziklai attach a meaning to the word "modulate" which differs from that generally employed in the art, and which therefore apart from apparent logical difficulties does not meet the applicable standard of patent interpretation.

A broad reading of the word modulate as proposed by Sziklai might, for example, extend the claim to include the prior art pulse sampling technique. Bedford testified that the pulse sampler used in the prior art devices was "a sort of modulator", albeit an unbalanced one.[73] This combined with a rather complex filtering system served as the equivalent of Moore's modulator and Sziklai's modulator-filter combination,[74] although the prior pulse sampling devices did not bypass the brightness signal.[75] Such a construction of this portion of the count— if it were a relevant inquiry here—would undoubtedly place its validity into question. This possibility provides an attendant reason for finding that "to modulate * * * to produce" means that the required signals must be produced by a modulator circuit, at its output.

■ I conclude the Board's interpretation of the count, urged by Moore, is affirmed and Sziklai is held not to have made adequate disclosure in the count.

### III. PRIORITY *

■ If the Primary Examiner was correct in deciding that Sziklai's application discloses the count [i. e., both the Board of Patent Interferences and this Court are in error], the issue of priority must be determined. An award of priority under the statute must be founded upon a finding that the successful inventor was first in time to conceive the invention and that he was either first to reduce it to practice or exercised reasonable diligence from the time of conception in achieving a reduction to practice. The Board held Sziklai was entitled to June

---

72. Record on Behalf of George C. Sziklai, p. 227.

73. Ibid. p. 230.

74. RCA in reducing the Sziklai device to practice actually used an unbalanced modulator followed by a filter system. This, they presumably would say is covered by the count. Tr. 271–288.

75. Although by-passing the brightness or monochromatic signal eliminates those problems associated with the translation of the color information to a high frequency range, nevertheless the basic problem (that of removing the original color signal by filtration) is still present in the Sziklai device. Indeed, this, his device, will still require complicated sophisticated filters of the type which, in theory, the use of sine-wave modulators was meant to eliminate.

* Under the precise holding in this opinion, the rest of the discussion is a hybrid type of dicta. The articulation on the question of chronological *priority* simply permits an appellate court to know my views.

22, 1950 as his date of conception, the date that his application was filed.[76] Moore does not question Sziklai's assertion that as a matter of law, Sziklai is entitled to June 22, 1950 as his date of reduction to practice. But Moore attempted to prove that *his* conception date was about April 15, 1950. The Board refused to accept this date, and held the evidence disclosed that Moore conceived the invention sometime before May 3, 1950. This finding is challenged by Sziklai. Moore alleged, and the Board accepted, that his invention was reduced to practice during March of 1951. Moore alleged diligence from his date of conception to March, 1951, the date of his reduction to practice. The Board found that Moore did not prove diligence from immediately prior to May 3, 1950 to July 1, 1950, but did prove diligence from July 1, 1950 to March, 1951. Moore at trial reasserted his continuous diligence. Sziklai argues that the Board was right in finding a lack of diligence from May 3, 1950 to July 1, 1950, but wrong in finding diligence from September 1950 to March 1951.

Three questions are thus presented: 1. does Moore prove prior conception; 2. does Moore prove a reduction to practice; and 3. does Moore prove adequate diligence.

a) Moore's evidence of conception:

Conception is "the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice." Townsend v. Smith, 36 F.2d 292, 295, 17 CCPA 647. Proof of the fact of conception requires disclosure of the invention to other persons, as the uncorroborated testimony of the inventor is not sufficient to establish this fact. 2 Walker on Patents, [1937 Ed.] § 201, pp. 919. Evidence of disclosure to others may be either oral or written; its admissibility at trial being subject to the applicable tests of credibility which govern the course of any litigation. Here, Moore's proffered evidence is both parol and written.

The written evidence consists of a document disclosing certain receiver circuits which is dated April 15, 1950, and which contains on page two the cryptic notation, "Does bal modul modulate." Moore testified that he wrote the phrase:

"* * * for the purpose of reminding myself to think out further the actions which take place in balanced converters and balanced modulators in order to see if the desirable function of balancing, which was highly useful in the receiver block diagram, was not in fact equally useful in the transmitter application."[77]

As suggsted by his testimony, Moore had not, at the time of the notation, formed a definite idea of the complete operative invention required by the patent standard of conception. When asked:

"Q. 41. And did you carry out this plan of considering the matter further?"

Moore testified:

"A. Yes, I did, and I came to the conclusion that as suspected, the balanced modulator would indeed be very useful in a color signal generating equipment."[78]

While it is undisputed Moore conceived of the invention, his testimony does not reveal with preciseness at what time this conception was first formed. Moore's

76. Sziklai set forth May 3, 1950 as his date of conception in his preliminary statement. The Board refused to adopt his contention because the patent disclosure upon which Sziklai relied failed to support the count. The correctness of this determination need not be reviewed as Moore contends that his conception was before May 3, 1950.

77. Record on Behalf of Moore before the Patent Examiner, p. 24.

78. Ibid. p. 25.

written evidence, considered by itself, thus cannot establish a date of conception. Moore's parol evidence consists of the testimony of three witnesses: Bingley, Bradley, and Burgett, all engineers employed by Philco.

At the time the written notation was made, Moore occupied an office with Bingley.[79] Before the Patent Examiner, he testified that he frequently discussed his ideas with Bingley, that he did discuss the invention with him, and that this took place within a few days subsequent to April 15th although he could not recall the specific meeting.[80] Bingley testified the meeting probably occurred on April 17th.[81] This, he inferred from his observations that Moore was always prompt in discussing his (Moore's) ideas with him and that April 15th was a Saturday. He reasoned that Moore probably thought out the invention over the week end and then discussed it with him on Monday, April 17th. Though there is little doubt that Moore, at some time, told Bingley about the invention, the evidence does not indicate at what date this communication took place, and Bingley's presumption of recall cannot fill this gap. The fact that Moore on October 15, 1951 signed a disclosure of the invention alleging conception on June 1, 1950 lends credence to this conclusion, although, as Moore testified,[82] this disclosure was based on an estimated date without any check of his records. Where, as here, the parol evidence consists of testimony of witnesses "who might be prodded by the eagerness of interested parties" courts usually demand additional contemporaneous corroborating proof. Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co. (Barbed Wire Patent), 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154.

Bradley's testimony that he learned of Moore's invention from Bingley at lunch [83] suffers from the same infirmities which attach to the testimony of Bingley. At best, it is merely cumulative. In addition, Bradley's testimony is hearsay on hearsay, since it is introduced to prove the truth of Bingley's statement that Moore disclosed the invention to Bingley. For this reason, Bradley's testimony is not admissible and will not be considered to prove Moore's disclosure.

Burgett testified before the Primary Examiner that on May 3, 1950 he began work [84] on "alternate means of presenting color to an index type of display, which was based upon the use of translating the frequency from that which was present in the composite color signal to that which was used in the index type of display by means of balanced mixers." [85] This testimony was based upon his laboratory record, on which the May 3rd date appears.[86] He further testified:

"Before beginning this second portion of this work, that shown on pages 19 through 37, Mr. Moore again discussed at great length the system problems, first the ideas which were then existent as far as system signal generation was concerned, that was the use of low pass filters, low pass channels, to pass the luminance information, and a separate channel which used balanced modulators, which would impress the chrominance information upon a color carrier. By use of this technique, Mr. Moore explained that it eliminated the problems of direct

79. Ibid.

80. Record on Behalf of Moore before the Patent Examiner, p. 25.

81. Tr. 177–178.

82. Record on Behalf of Moore Before the Patent Examiner, p. 26–27.

83. Tr. 246–247.

84. Record on Behalf of Moore Before the Patent Examiner, p. 136.

85. Ibid. p. 134.

86. Sheet 20, Notebook No. 4071; Moore's Exhibit 4 before the Patent Examiner. PX. 1–14.

feed-through of the signal which was applied in the output." [87]

Testifying further, he said:

" * * * By reference to Sheet 20 of Notebook No. 4071, dated May 3rd, 1950, we find that I have noted or written down here the use of a balanced mixer, for translating the frequency from that which was used in the composite color signal to that which was used with the index display device.

"In order to have written this down here, I must have had prior knowledge of this circuitry and these techniques from discussion with Mr. Moore before undertaking this work. Therefore, my discussions with Mr. Moore must have occurred before May 3rd, 1950." [88]

The Board, in awarding Moore a conception date, "at least by May 3, 1950," relied primarily upon Burgett's testimony.[89] This, they said, considered with Bingley's testimony was enough to establish conception.

 Sziklai attacks this finding on the ground Burgett's testimony should not be entitled to the weight given to it by the Board because it was uncorroborated by either Moore or Creamer, his immediate superior. Though such corroboration is lacking, Burgett's testimony considered with the laboratory notes carries conviction. Considered with Bingley's testimony, Moore's testimony, and the written evidence, it provides sufficient basis to support the findings of the Board which will not be disturbed.

#### b) Moore's reduction to practice:

Moore's reduction to practice consists of the parol evidence of Philco engineers

that certain tests were performed in March 1951 and that these tests were successful.[90] Sziklai does not deny that these tests were made, but challenges the evidence as sufficient to sustain Moore's proof that they were "satisfactory".

 Reduction to practice is a question of fact which may be proved either by written or parol evidence. The testimony contained in the first two volumes of Moore's Record before the Primary Examiner and that adduced at trial reveals that specific tests were conducted to determine the operability of the invention. This evidence Sziklai is willing to accept as reliable.[91] It would seem to follow there is no cogent reason suggested by the evidence, or by Sziklai, to invalidate the witnesses' conclusions that the test results were, in fact, satisfactory. Where, as in S. & S. Corrugated Paper Machinery Co., Inc. v. George W. Swift, Jr., Inc., 78 USPQ 71, aff. 3 Cir., 176 F.2d 358, parol evidence of tests is general in nature and indefinite, the Court may, as Sziklai argues it should, require additional contemporaneous and supporting records to prove reduction to practice. But here, the parol evidence suggests sufficient specificity and since Sziklai does not directly attack its validity, the evidence establishes Moore's reduction to practice without the need of additional corroborating records.

#### c) Moore's diligence:

As the junior party in this action, Moore must prove he was continuously diligent in developing his invention from May 3, 1950 to March 1951. Sziklai concedes,[92] as the Board held,[93] that the work on the construction of the transmitter device which was done from July 1, 1950 through September 1950 constitutes

---

87. Record on Behalf of Moore Before the Patent Examiner, p. 134.

88. Ibid. p. 136.

89. Decision of the Board of Patent Interferences, p. 18.

90. Record on Behalf of Moore Before Patent Examiner, Vol. 1, pp. 295–297, 94–95, 52–54. Tr. 180.

91. Brief for Plaintiff, p. 49.

92. Ibid. p. 42.

93. Decision of the Board of Patent Interferences, p. 18.

diligence; but Sziklai asserts Moore's work performed from May 3, 1950 to July 1, 1950, and from September 1950 to March 1951 does not constitute diligence. True, with the exception of Bittman's work, all of the activity of Moore and his associates, during the contested portion of the critical period, was directed to the development of a colored television receiver.

Bittman's work of contribution will be discussed first. On June 21, 1950 Bittman began construction of a 3.58 megacycle subcarrier generator which was subsequently used as a part of the completed transmitter.[94] This work continued until July 19, 1950. The Board, finding that Bittman's work could not be counted as diligence, stated:

> "Such work has an obvious relation to color television transmitters in general and Bittman testified to the effect that when he began his work he knew of the intention to develop a new color signal generating system and that the 3.58 megacycle generator was to be used in the new system (Moore Record 110, Q95 and 96). However, we find nothing in the record to indicate that Bittman knew that the new system included the invention defined by the present count. It is true that there is no evidence of another new system under consideration at Philco at that time, but we do not consider that an inference from this negative circumstance is sufficient to support the burden of proof which rests with the junior party." [95]

▆▆▆▆▆ Diligence in reduction to practice must be related to the development of the invention. Bittman's work

meets this test. His work was assigned to him at a Philco Scheduling Meeting held June 30, 1950.[96] The purpose of the meeting was to set up a time schedule for the detailed construction of the various parts of the invention. Although Bittman may have been ignorant of the relationship of his work to the construction of Moore's invention, his activity was determined and evaluated at all times by those who did. For this reason, Bittman's work should be counted as part of the diligent activity leading to Moore's reduction to practice. The Board was in error in concluding otherwise.

Moore and his associates concurrently adopted two exploratory approaches in their attempt to develop a color television receiver.[97] The first involved the development of a single tube with phosphorous strips disposed upon it to provide the necessary color picture display, known as the "Apple" tube. The second involved the development of a trinoscope display, using three separate tubes, whose images are superimposed one upon the other by means of mirrors. After extensive investigation of both possibilities, work on the "Apple" tube was abandoned and the work on the trinoscope device was continued, culminating in a satisfactory color receiver mechanism. Work on both devices proceeded before July 1, 1950 and after September 1950. The Board held that the receiver work during the period of September 1950 to March 1951 constituted diligence on behalf of Moore.[98] It found that an adequate field test of the transmitter, necessary to a reduction to practice, could not be performed without a suitable television receiver, which was not available at the time of invention and therefore

---

94. Record on Behalf of Moore Before the Patent Examiner, p. 195.

95. Decision of the Board of Patent Interferences, p. 20.

96. Tr. 189–192; Record on Behalf of Moore Before the Patent Examiner, p. 31–34.

97. Tr. 216.

98. Decision of the Board of Patent Interferences, p. 19.

had to be developed. However, the Board held that the receiver work which took place before July 1, 1950, represented by Burgett's activity, could not be counted as diligence. The Board stated:

"The work of Burgett relates entirely to a receiver using a particular type of tube termed an 'index tube', and we find nothing either in Burgett's notes for this period (Moore Exhibit 4) or his oral testimony which relates to the particular signal generator of the count." [99]

Burgett's work concerned the frequency requirement of the Apple tube receiver. Through testing he determined that the transmitter embodying Moore's invention could be constructed with a subcarrier frequency chosen independently of the Apple tube's frequency requirements.[100] In addition, Bingley testified at trial that determination of the Apple receiver frequency requirements was necessary to determine the frequency of the transmitter's circuits. Therefore, his work had to be completed before work on the transmitter itself could begin.[101] Bingley's testimony is supported by that of Moore's taken before the Primary Examiner. From this testimony it would appear Burgett's work did relate to the development of the invention.[102] It is further apparent that when Burgett undertook his work he knew it had a direct relation to the construction transmitter as it related to the Apple receiver.[103] His work, concerned entirely with a receiver, laid part of the framework for the determination of the transmitter frequency currents. It may, therefore, be considered as a part of the developmental work of the transmitter which constitutes diligence on behalf of Moore. The Board's inference fact on this phase of the evidence is not accepted.

But the Board's finding of diligence between September 1950 and March 1951 is supported. Diligence requires that the inventor's activity must be continuously directed towards a timely reduction to practice of the invention. Keizer v. Bradley, Cust. & Pat. App., 270 F.2d 396; Thompson v. Dunn, 166 F.2d 443, 35 CCPA 957. Where, as here, the situation is such that a second invention is so related to a first invention that it is necessary to develop the first before the second can be properly tested, the development period of the first invention should be counted as part of the diligence in the development of the second. Otherwise, it would be impossible for the inventor to prove any diligence regardless of what he did, a result destructive of any legal value of diligence as a concept. Sziklai does not question this result. He concedes a satisfactory test of the invention required a reliable receiver.[104] But he argues Philco could have easily constructed such a receiver for testing the transmitter before March 1951.[105] The Philco engineers, he points out, could have constructed a reliable trinoscope receiver sometime around the time of the invention and therefore the receiver development program which they subsequently undertook, constituting the simultaneous development of two different kinds of receivers, while perhaps diligence in the construction of a receiver, cannot be counted as diligence in the construction of the transmitter.

First, Sziklai cites Bradley's testimony taken in the Bradley v. Keizer interference that Philco engineers knew "the principles of color television and the principles of a receiver to receive it." [106] However, Bradley's testimony is:

"RDQ. 426. Did you know at that time how to make such a receiver?

99. Ibid. p. 20.

100. Record on Behalf of Moore before the Patent Examiner, p. 141.

101. Tr. 188.

102. Record on Behalf of Moore before the Patent Examiner, pp. 28–29.

103. Ibid. p. 136.

104. Plaintiff's Reply Memorandum, p. 9.

105. Brief for Plaintiff, p. 48–49.

106. Ibid. p. 46.

A. I should say yes. We knew perfectly well how to make a receiver even though we knew it would involve a great deal of work."[107]

Yet, while it may be true, as Bradley states, that Philco engineers knew the principles of a color television receiver at an early date, there is no evidence that the actual work in constructing such a receiver, work which Bradley testified would be extensive, could be done before March 1951. It was not knowledge of how to construct a receiver, but the actual finished workable device which was required to test the invention in suit.

Second, Sziklai cites certain testimony given by Creamer at the Bradley v. Keizer interference.[108] Sziklai argues this testimony is to the same effect as Bradley's and as a matter of proof suffers from the same infirmities as Creamer's subsequent testimony demonstrates. Finally, Sziklai shows that Philco employees attended certain RCA demonstrations of a color trinoscope receiver in 1949, that the devices used in those demonstrations were described in RCA bulletins on color television which Philco received and used, and that in February 1950 Philco received detailed RCA drawings of a trinoscope receiver which were also used in constructing the receiver made for the March 1951 tests. Thus, he suggests the information supplied by RCA was sufficient to facilitate easy construction of a trinoscope receiver by Philco long before March 1951; therefore, it was unreasonable for Philco to extend the receiver development program by work on the Apple device.[109] It is for this reason, plaintiff argues, that the receiver development work by defendant should not be counted as diligence in the construction of the invention in suit. But, there is substantial evidence to reveal that the prior RCA demonstrations and subsequent bulletins did not provide sufficient information to enable construction of a receiver which could be used for a "system" test.[110] For example, the disclosed circuits were faulty in accuracy of color carrier regeneration.[111] Much more work was required to achieve the desired degree of reception reliability. Considering such problems alone, it was not unreasonable for the Philco engineers to proceed with work on the Apple display device. As Bingley testified, they:

"* * * did not know whether the Apple type display would be available prior to the trinoscope display; and I think I have already testified that [they] felt that it was highly desirable to have a receiver available at the earliest possible moment." [112]

 The findings of the Board in holding that the receiver work done by the Philco engineers between September 1950 and March 1951 should be considered as diligence on behalf of Moore, is affirmed, with the additional finding and conclusion made, infra.

In conclusion, the decision, here, is:

1. The Board decided the Sziklai application did not disclose the invention defined by the count and, therefore, did not meet the statutory requirements for disclosure of an invention. This was a question of law, which this Court can decide as well as the Board. As a matter of law, as stated supra, I reach the same conclusion as did the Board that the party Sziklai is not entitled to prevail because his application does not disclose the invention constituting the issue of interference.

2. The Board found the party Moore conceived the invention prior to May 3, 1950, the earliest date alleged for con-

107. Vol. II, Record on Behalf of Moore Before the Patent Examiner, p. 447.

108. Brief for Plaintiff, p. 47–48.

109. Ibid. pp. 46–48.

110. Tr. 290–294; 294–297.

111. Tr. 295.

112. Tr. 216.

ception by Sziklai, and that Moore reduced the invention to practice by March 31, 1951. After reviewing the evidence adduced before the Board and before the Court, at trial, I independently make the same finding on the basis of all the evidence.

3. The Board found the party Moore was diligent in reducing the invention to practice from July 1, 1950 to his reduction to practice in March 1951—but, the Board also found Moore was *not* diligent during the period from just prior to June 22, 1950 (Sziklai's filing date) to July 1, 1950. The Court is aware that findings of the Patent Office concerning priority dates are findings of fact which should be accepted unless the Court is convinced "that the decision of the Patent Office was without substantial basis in the evidence or was wrong as a matter of law." [Minnesota Mining & Mfg. Co. v. Carborundum Co., 3 Cir., 155 F.2d 746, 749; S. & S. Corrugated Paper Mach. Co. v. George W. Swift, Jr., Inc., 3 Cir., 176 F.2d 358, 361]. But, as the trial, here, was *de novo,* in view of my discussion, supra, it is clear from all the evidence, both before the Board and the Court, the Board was correct in finding that the work from July to September 1950 on color transmitting apparatus and the work on the color receiver continuing from that time to March 1951 constituted diligence by Moore.

But, as a matter of law, I think the Board erred in 1. failing to recognize that the work of Burgett and Bittman from May 3, 1950 to July 1, 1950 was *part* of the diligent work on the transmitter apparatus to embody the invention, and 2. in failing to recognize that the work on the color television *receiver* throughout the critical period to completion of the transmitter device was diligence toward reduction to practice of the invention in suit.

4. On the basis of either of the master conclusions by the Court, a dismissal of the complaint will be ordered.**

** The present writing when filed will be considered a compliance with FR 52.