SUPERIOR CONCRETE ACCESSORIES,
INC., a corporation, Plaintiff,

v.

RICHMOND SCREW ANCHOR CO., Inc.,
a corporation, Defendant.

No. 1176.

United States District Court
W. D. Missouri,
St. Joseph Division.

July 19, 1965.

Norman H. Gerlach, Chicago, Ill., Ronald S. Reed, Sr., of Reed & Reed, St. Joseph, Mo., for plaintiff.

Alan K. Roberts, New York City and Gordon D. Schmidt, of Hovey, Schmidt, Johnson & Hovey, Kansas City, Mo., for defendant.

DUNCAN, Senior Judge.

The plaintiff, a Delaware corporation, with its offices and principal place of business at Franklin Park, Illinois, instituted this suit against the defendant, a New York corporation, with a regular and established place of business at St. Joseph, Missouri, within the Western District of Missouri, under the Patent Laws of the United States, alleging among other things, that it was the owner of United States Patent No. 2,985,-936, issued on May 30, 1961, to Bror Hillberg, and entitled, "Hanger Assembly for Suspended Concrete Forms", and Patent No. 2,985,937 issued on May 30, 1961, to Bror Hillberg, and entitled, "Outside Hanger Assembly for Suspended Concrete Forms".

Plaintiff alleged infringement of its patents and sought injunctive relief, damages and attorneys' fees. The patents will be referred to hereafter throughout this opinion, as Patents '6 and '7, as they were throughout the trial of the case.

In its Answer and Counterclaim, defendant admitted the jurisdiction of the court, the ownership of the patents by the plaintiff and denied infringement, alleged that the patents were invalid and void, and asked the court to so decree. To find lack of infringement by the defendant, and that plaintiff be enjoined from harassing the defendant.

Defendant bases its contention of invalidity on the grounds: (1) that the specifications and claims in both patents are vague, indefinite and unsupported in vital areas as well as prolix—(defined by the defendant as "excessively wordy"); (2) that they were unpatentable over the prior art and similar devices in general use by plaintiff and defendant prior to plaintiff's patent, and (3) that they were void because of double patenting.

Defendant contends that plaintiff's patent is anticipated by the prior art and cites as such prior art, British Patent No. 358,708; Mueller Patent No. 2,-215,972 (Defendant's Exhibit P) and Dickman Patent No. 1,851,353 (Defendant's Exhibit Q), and certain drawings referred to as the "Jablonski Drawings".

Defendant in its brief does not seriously discuss the relative functions of the elements described in the various prior art patents as compared to the patented device or the accused device, with which we are here concerned.

The patented devices, " '6" and " '7" are generally referred to in the trade as the "90–90 Press Steel Hanger" ('6), and "90–45 Outside Hanger" ('7).

The application for both patents, issued on January 4, 1960 to Bror Hillberg and thereafter assigned to the plaintiff on May 30, 1961, stated:

"The present invention relates to hanger assemblies for concrete forms, such assemblies being employed for hanging concrete forms from bridge superstructures or the like. The invention has particular reference to a novel form of hanger assembly which, when under load in an actual installation, is devoid of destructive torsional, bending and other stresses which frequently result in disruptive strain in connection with conventional hanger assemblies designed for the same purpose."

The specifications are numerous and lengthy. There were eight claims in the patent as finally issued, but only six of them are in controversy here, 1–3–4–5–6–7:

"1. A three-part strut assembly adapted to rest on and extend transversely of the top flange of a substantially horizontal metallic I-beam or like structure and to support at the sides of the beams a pair of vertically extending form-supporting bolts having nuts. at the up-

per ends of their shanks, said strut assembly comprising a single elongated horizontal tie rod of strong rigid metal and a pair of separately formed suspension devices at the ends of the tie rod, said suspension devices being formed of elongated strips of stamped strong rigid metal of appreciable width and bent medially of their end edges to provide U-shaped structures having substantially parallel side portions, and intermediate connecting bight portions, the ends of the tie rod projecting between and being welded to said side portion of the suspension devices in close proximity to the upper edges of the latter and defining, in combination with said suspension devices, closed loops presenting vertically elongated openings for receiving with but comparatively little lateral looseness the shanks of the bolts, said strut assembly being of such length that when it is in its operative position with respect to the I-beam the lower edges of the inner regions of the side portions of the suspension devices seat on the upper face of the upper flange of the I-beam and the outer regions of said side portions together with the bight portions overhang the longitudinal edges of said upper flange, the upper edges of the overhanging parts of the suspension devices being designed and adapted to underlie the underneath faces of the nuts, said overhanging parts of the suspension devices being adapted when the nuts are tightened and the forms which are supported by the bolts are loaded to be forced downwards to a slight extent to the end that the lower edge portions thereof extend below the level of the upper face of the upper flange of the I-beam and thereby prevent inward shifting of the suspension devices with respect to said upper flange, said suspension devices being of such materially greater maximum height than maximum width that when the strut assembly is in use, the tie rod is disposed a substantial distance above the upper flange of the I-beam with the result that the load on the bolts places the portion of the tie rod between the suspension devices under appreciable tension thereby preventing it from being subject to any appreciable upward bending and resultant outward and downward tilting of the suspension devices as a whole.

3. A strut assembly as set forth in Claim I and wherein the side portions of each suspension device are instruck in certain regions thereof to form spaced vertical ribs on the inside faces thereof, and such ribs are welded to the side portions of the adjacent end of the tie rod.

4. A strut assembly as set forth in Claim I and wherein the lower edge portions of the connecting bight portions are inclined upwardly and outwardly to provide anti-shear relief regions for bolt-shank clearance purposes.

5. A strut assembly as set forth in Claim I and wherein each of the side portions of each suspension device has formed along the lower edge thereof a row of downwardly projecting teeth adapted to bite into the metal of the upper flange of the I-beam when the concrete forms are loaded.

6. A strut assembly as set forth in claim 5 and wherein each row of teeth is fully coextensive with the lower edge of the side portion of the suspension device on which it is formed so that certain of the outermost teeth of the row overhang the adjacent side edge of the upper flange of the I-beam.

7. A strut assembly as set forth in claim 5 and wherein each row of teeth is generally of saw-tooth design and embodies vertical inwardly facing edges and inclined outwardly facing edges."

In simple language, the patented device is designed to sustain the scaffolding attached to the steel I-beam onto which concrete is poured in the formation of the floor or surface of concrete bridges. The following reproduction of an exhibit demonstrates how the device functions when assembled in actual use.

Briefly plaintiff describes its patented device as an assembly which consists of but three parts, namely, a horizontally extending steel tie rod and two oppositely disposed U-shaped suspension devices at the ends of the tie rod. The suspension devices are in the form of stampings from plate steel and embody curved intermediate bight portions and generally parallel side portions.

The upper inner corners of the side portions of the U-shaped suspension devices are welded to the ends of the tie rod. The curved bight portions are spaced outwardly from the end extremities of the tie rods and form therewith vertically elongated openings for receiving the upper ends of the shanks of the aforementioned nut and bolt assemblies.

The nuts of such assemblies rest on the top surfaces of the portions of the suspension devices which overhang the side edges of the top flange of the I-beam. The generally parallel side portions of the U-shaped suspension devices are characterized by the fact that they have vertically extended instruck ribs which have a two-fold purpose or function in that they reinforce the suspension devices and form inwardly facing surfaces for welded connection to the ends of the tie rod.

The side portions of the suspension devices are further characterized by the fact that they embody on their lower edges saw-like teeth which grip or bite into the top flange of the I-beam and serve to resist inward movement of the suspension devices when the hanger assembly as a whole is in its loaded condition. That is, when it is subject to the load of the wet concrete which is poured onto the form structure that

is suspended and supported by the nut and bolt assemblies.

The outer lower corners of the U-shaped suspension devices are cut away on upwardly and outwardly inclined planes in order to reduce the amount of shear to which the shanks of the bolts are subjected when the assembly is in its loaded or operative position.

After the concrete has been poured onto the forms which are supported by the bolts attached to the hanger and has "set" or hardened, the bolts are unscrewed from the bottom and withdrawn through the concrete. The wooden forms now may be removed. After the removal of the wooden forms, the hanger devices and the two nuts remain permanently in the concrete.

It will be observed that the teeth of the "bight" portion of the device extends over the edges of the I-beam. Claim 5 provides for these projecting teeth to overhang the upper flange of the I-beam when the concrete forms are loaded. The bights are welded to the connecting bar in such manner that the outer edges thereof are slightly higher than the inner portion, so that when weighted by the concrete there is a minimum of bowing of the connecting rod and distortion of the device.

The lower edge of the connecting bight portions are inclined upwardly and outwardly to provide relief regions for bolt shank clearance purposes. Simply stated, it means that the lower or bottom portion of the bight of the U-shaped opening through which the suspension bolts are placed, is cut, as a layman might say, "on the bias", so that when the pressure is placed on the device by the weight of the concrete, the bolts do not bend, thus enabling them to be removed without difficulty after the concrete has hardened. A copy of Exhibit 16 of the patented device follows.

Both parties involved in this controversy have long been competitively engaged in the manufacture and sale of engineering type devices, anchorages and accessories and various types of tying devices used in concrete construction. The patented device as well as the accused device, which we will later discuss, are manufactured in lengths suitable for use on different widths of steel beams.

We have carefully examined the patents which are relied on as prior art, and we are definitely unable to find any relevancy or similarity to the patented device or to the accused device, and therefore, see no reason for a lengthy discussion of the technical details of such patents.

We next come to what has been described as the "Jablonski Drawings" of the device relied on as prior art represented by the defendant's Exhibit J. Jablonski was an employee of the defendant in its St. Joseph office, and he says that in 1958 he prepared a drawing for submission to a prospective purchaser in Denver. He also testified that a model was made and tested in accordance with the shop drawings and sent to Mr. Bill Hughes, with the Booth-Rouse Equipment Company.

Although another witness not connected with the St. Joseph office testified that he believed some of these devices were manufactured and sold, Mr. Jablonski had no knowledge as to whether any were ever manufactured or sold in ac-

cordance with his design, and no shop or other records of the defendant were produced to show whether or not this device had ever been manufactured and used.

Counsel for defendant stated that the defendant was not relying upon sale, that the design was introduced in evidence to show public use.

Apparently this design called for 4⅜″ bars or wires being welded to a solid flat strap on each end thereof and connected together by welding a ½″ diameter steel coil into which the sustaining bolts were screwed. This element was designed for use primarily in what was then a comparatively new prefabricated concrete I-beam, and the overhang was designed for bolts to extend through the coil. A reproduction of the design follows.

Whether or not the evidence is sufficient to show public use, which we think it is not, it is our conclusion that the design itself may not be relied upon as prior art to void the patents.

We next come to the contention of the defendant as to the invalidity of the patents for vagueness, indefiniteness, etc., of Patent '6. The defendant asks us to find that vital areas of the patent claims are indefinite.

In its after trial brief and in its brief in support of its Motion for Summary Judgment, the defendant calls the court's attention to many descriptive phrases and words throughout the specifications. It charges that it is prolix and does not properly disclose the actual teachings of the patent.

We carefully considered this question at the time the Motion for Summary Judgment was overruled by the court, and have again reviewed the question. We believe that no additional evidence has been presented to the court which would justify a different conclusion.

We agree with the defendant that there is some indefiniteness to be found in the specifications and in the claims. Such specifications and plans are "excessively wordy". However, it is our conclusion that a reading of the specifications and the claims by one versed in the art would enable such person to reproduce the device. We think that complies with the legal requirements.

The defendant also contends that the patent is invalid because it is neither new nor novel, but simply the result of mechanical skill as developed throughout the years in the manufacture of hanger devices both by the plaintiff and the defendant. The most closely related application of the prior art is fairly represented by defendant's Exhibit A. A reproduction follows as a part of this memorandum.

Both the plaintiff and the defendant manufactured comparable devices and sold them extensively before the patented device was placed upon the market by the plaintiff.

We believe that there is more than mechanical skill evidenced in conceiving the patented device over that of the prior art. The bight elements containing the teeth designed to prevent slippage are significant, as well as the single bar connecting the bight elements, thus substantially decreasing the cost of manufacture of the element, as was shown by the evidence.

Defendant contends that both patents '6 and '7 are invalid because of double patenting. We cannot agree with defendant's contention in that regard. Even if defendant's contention as to double patenting is correct, we cannot agree that it would void patent '6—the first of the two patents issued.

The respective parties in their briefs have cited the usual authority with respect to the validity of the patents and to the interpretation of their claims. We recognize the well established principle that the issuing of a patent by the Patent

Office is prima facie evidence of validity, and that the burden of showing its invalidity rests upon the one who attacks it. That is a heavy burden. We also recognize the principle of law that the burden is upon the plaintiff to show infringement. It is our conclusion that the patent is valid.

The exhibits before the court show that the patented device and the accused device have slightly different types of teeth. Those contained on the patented device are somewhat smaller and slightly different in design than those appearing on the accused device.

It is the contention of the defendant that its device does not infringe because there is no provision for overhang which in the patented device is designed for the purpose of preventing slippage. It is also defendant's contention that the teeth on its device are not designed "to cut into the top of the metal flange". It is the contention of the defendant that its device was intentionally designed so that there should be no overhang on the outer edge of the I-beam, as is provided in the plaintiff's patented device. The following copy of plaintiff's Exhibits 14 and 16 demonstrate the mechanical similarity of the devices.

On the accused device the outer ends of the bights are not cut on an angle or on the bias. It is defendant's contention that this is intentional so that when the concrete is poured onto the form, the rod connecting the bights will bow upward from the weight causing the upright bolts to be "snugged" against the outer edge of the I-beam, thus preventing slippage.

The question of whether or not there is an overhang depends entirely upon the length of the device. The evidence reveals that there is a recognized tolerance in the manufacture of I-beams ranging from $\frac{5}{32}''$ under 12" to $\frac{1}{2}''$ over 12". Defendant contends that its device is custom made, i. e., in accordance with the contractor's specifications, and regardless of the tolerance in the I-beam, the hanger would be manufactured to correspond and there would be no overhang.

The following reproductions of exhibits show the relative appearance of the devices when set up to perform their intended function. The top photo reveals the patented device (Exhibit 4), and the accused device (Exhibit 6). The lower photo reveals the accused device only (P. Exhibit 14).

We also include a reproduction of defendant's comparison of the difference between the patented device and the accused device with respect to the overhang.

The teeth in the accused device are sawtooth in design extending inwardly from each end of the device. We find great difficulty in agreeing with the defendant that they were not designed to nor will they cut into the top of the I-beam however slight the bite might be and would not affect the slippage.

It would seem from even a casual observation of the teeth that their very construction would indicate that they are more likely to cut into the top of the beam and prevent or decrease slippage to a greater degree than the smaller teeth in the patented device. We believe that the following reproduction of Defendant's Exhibit F reveals the shape of the teeth.

We believe that the accused device performs substantially the same function in substantially the same manner as the patented device, and that whether or not there is an overhang would depend entirely on how the device is constructed with respect to the distance between the outer edges of the bights. That is, the distance between the teeth on the outer edges of the bights.

Another slight difference between the patented device and the accused device is the size of the opening through which the supporting bolt extends. In the patented device the hole in the opening is substantially larger than in the accused device, so that there is more play or space, thus preventing a bending of the bolt, whereas the opening in the accused device is approximately bolt size, and when the pressure is on the device, inevitably there must follow a bending of the bolt.

There is some dispute between the parties as to the extent of the bending. The defendant states that this bending, insofar as it has been able to ascertain, has not interfered with the practical aspects concerning the removal of the bolt after the concrete has set.

It would stand to reason that if there is a substantial bend in the bolt, it would be difficult, if not impossible in some instances, to unscrew the bolt from the bottom and remove it, or to remove the scaffolding without either sawing or cutting the end of the bolt. Thus the bolt is left in the concrete. These bolts, according to the evidence, cost approximately 30¢ a piece, and are a very substantial item of expense to the contractor in the construction of a bridge.

The length of the patented device (Exhibit 16) designed for a 12″ beam is 13⅞″, whereas the length of the accused device is 13¹¹⁄₁₆″ or ¼″ longer. The distance between the top of the bights on either end of the connecting rod in the patented device is 9⁵⁄₁₆″, whereas the accused device is 9¹¹⁄₁₆″ or ⅜″ longer. The distance between the bottom of the bights of the patented device is 10¾″ and the accused device is 10⅛″ or ⅝″ shorter.

The length of the teeth of the bight in the patented device is ¹¹⁄₁₆″ and the accused device is 1″, or the latter is ⁵⁄₁₆″ longer. The distance between the inside of the holes to receive the upright bolts in the patented device is 10¹¹⁄₁₆″, where-

as the space in the accused device is 10¹⁄₁₆″ or ⅝″ shorter. The space between the outer edges of the teeth in the patented device is 12¼″ and that of the accused device 11¾″ or ½″ difference. We give these dimensions as illustrative of the theory of the overhang.

The patented device enjoyed very substantial commercial success.

■ It is our conclusion that the accused device infringes Claims 1–3–5–6–7 of the '6 patent. The accused device does not infringe Claim 4 due to the fact that it does not have the cut out or sloping end.

The applications for the two patents were filed at the same time and were issued on the same day. The '7 patented device and the accused device bear exactly the same relative likeness to each other as the patented device and the accused device in the '6 patent.

If the '7 patent is valid, then the defendant's accused device infringes. The inner end of the '7 patent is identical with that of the comparable end of the '6 device. The bight on the outer end of the patented device is so constructed that when welded onto the connecting rod, the hole therein designed to receive the bolt to hold the wooden form of a skirt or an addition to the outer edge of the structure it is being utilized to support, is on a 45° angle instead of being upright or perpendicular.

The teeth are identical and has the same overhang so that when the pressure is placed upon the form by the pouring of concrete thereon, the outer edges of the teeth will prevent the slippage of the hanger. Because of the 45° angle of the welded bight on the outer end of the hanger and the 90° angle on the other end, this hanger is referred to in the trade as the "90–45 Outside Hanger".

The only distinction between the above described device and the accused device is that found in the '6 patent. That is, the lower part of the bight of the patented device is cut on an angle whereas the accused device is horizontal.

In the patented device the end of the 45° angle bight is perpendicular, and the bottom or teeth portion is at right angles with the upright or perpendicular end of the bight, whereas the same element or bight on the accused device is not perpendicular, but extends on an angle of approximately 45° inwardly from the lower end thereof and downward to the teeth portion. On the upper portion of the downward and inward angle, the end of the bight is cut on the bias extending upward.

Copies of the patented and accused devices follow to reveal the structural differences of the 45° angle bights on the outer ends of the hangers.

While there is some substantial difference in the structural design of the outer bights, we believe that the accused device performs the same function in substantially the same manner as the patented device.

The use of an angular bolt or device for securing wooden forms for an apron or outer structure on a bridge is not new in the trade and has long been used for structural purposes where an overhang or apron is being constructed. In In re: Simmons, 136 Patent Quarterly 450, 312 F.2d 821 the court said:

"Even though all of the claims of the patent and of the application might exist side by side in one application without restriction being required, as argued by appellant, they may not exist in two separate patents unless two patentable inventions exist. The mere fact that appellant filed two separate applications in the considered belief that two patentable inventions were present does not entitle him to two patents. Appellant suggests that he is being 'penalized' for not consolidating the copending applications. If appellant is penalized, it is his own doing."

We believe that the '6 and '7 patents were not two separate patents, and that two patentable inventions did not exist.

Considering the validity of the '6 patent as we have determined, the changing of the bight on one end thereof from a 90° angle to a 45° angle through which a bolt was placed, was not an invention, but was merely the result of mechanical

skill and was not patentable over the prior art as shown in the '6 patent. There was no reason why the applicant could not have included all of his specifications and claims in one application and in one patent.

■ ■ We agree with what was said by the Board of Patent Appeals in Ockert, 114 U.S.P.Q. 332:

"If only one inventive concept is present, two patents cannot properly be granted, regardless of the scope or relationship of the claims, or of the order in which the applications were filed or the claims presented."

We think only one patent concept was present and that plaintiff was entitled to but one invention. It is our conclusion therefore, that insofar as the 90°– 45° bight is concerned, the '7 patent is invalid.

The question of whether or not damages and attorneys' fees shall be allowed may be presented for later determination.

It is so ordered.