BOURNS, INC., a corporation, and Marlan E. Bourns, an individual,
Plaintiffs,

v.

DALE ELECTRONICS INCORPORATED, a corporation, Defendant.

Civ. No. 01432.

United States District Court,
D. Nebraska.

Dec. 29, 1969.

Mellin, Hanscom & Hursh [Oscar A. Mellin, and Carlisle M. Moore], San Francisco, Cal., Fitzgerald, Brown, Leahy, McGill & Strom [Lyle Strom], Omaha, Neb., for plaintiffs.

Zarley, McKee & Thomte [Donald Zarley, and Dennis Thomte], Des Moines, Iowa, James J. Holmberg, Columbus, Neb., White, Lipp, Simon & Powers [John J. Powers], Omaha, Neb., for defendant.

## MEMORANDUM

RICHARD E. ROBINSON, Chief Judge.

This matter was tried to the Court without a jury. The Court has been presented with testimony, documentary evidence, depositions and a series of briefs and is now ready to announce a decision, making the following findings of fact and conclusions of law.

Jurisdiction is vested in this Court by virtue of 28 U.S.C.A. § 1338(a), plaintiff, Bourns, Inc., and Mr. Bourns individually being citizens of the State of California and defendant, Dale Electronics, Inc., being a citizen and having an established place of business in the State of Nebraska. This is an action for infringement of plaintiffs' patents numbered 2,777,926, 2,935,716, 2,953,763, 3,-161,849 and 2,898,569. Defendant asserts by way of defense that the patents are invalid and non-infringed. It also defends by attempts to establish misuse, concealment during the formulation of military specifications and laches.

Certain motions have been made since trial and should be disposed of prior to stating findings of fact and conclusions of law. Defendant filed a request for oral argument for the purpose of allowing the parties an opportunity to summarize their respective positions. Because this case has been thoroughly briefed by each side the Court saw no need for further argument and orally so notified the parties. For purposes of the record that motion is now overruled. Plaintiff has also filed two motions to reopen trial and to offer additional evidence. Plaintiff's first motion relates to a pamphlet which plaintiff claims would state that teflon would be a material suited for use as a slider. Defendant states that should such case be reopened it would then have to attack the publication foundationally and then possibly present a countervailing opinion. The second motion relates to the

admission into evidence of a letter which would be offered to show proof of the concept that compliance with military specifications does not require infringement. Defendant again states a wish to attack foundationally as well as further reasons for cross-examination. Because, as will later appear in this opinion, the Court does not believe the material presented to be of such a controlling nature as would probably induce a different conclusion the motions will be overruled. Neither motion and the evidence which may be admitted would effect the decision as written and therefore no good purpose would be served by prolonging a matter in which a decision is long overdue.

It has also come to the Court's attention that the entry into evidence of plaintiff's exhibit 105 was not allowed after certain deletions were made. No objections were received after the deletions. For the record that exhibit should have been received and the record should now so indicate.

*Patent No. 2,777,926.*

 Plaintiff relies upon claims 1, 2, 11, 14, 15, 16 and 20 of the '926 patent. Defendant's primary thrust centers upon the validity of the '926 patent. Defendant's contention, among others, is that this patent is obvious. Non-obviousness is an element necessary for patentability under 35 U.S.C.A. § 103. The Court recognizes the presumption of validity as a result of allowance of the claims by the patent office and that the burden rests heavily upon the defendant to overcome that presumption in order to obtain a favorable decision. Superior Concrete Accessories, Inc. v. Richmond Screw Anchor Co., 246 F.Supp. 104 [W.D.Mo. 1965] aff'd 369 F.2d 353 [8th Cir. 1966]. However, this presumption will not stand in the face of compelling facts. "In such a case the court is not obliged to yield its judgment to a presumption which merely arises from the patent itself." American Infra-Red Radiant Co. v. Lambert Industries, Inc., 360 F.2d 977 [8th Cir. 1966]. In determining the validity

of the patent this Court must ascertain the essence and scope of the patent as stated in the above-mentioned claims. Once having determined its essence it is then necessary to establish, among other elements, whether the patent, as defined, is obvious using the guidelines laid down by the Supreme Court. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 [1966] and restated by the Eighth Circuit in National Connector Corp. v. Malco Mfg. Co., 392 F.2d 766 [8th Cir. 1968].

 The basic instrument involved in this litigation is a leadscrew-adjusted potentiometer [LSAP] which has for its general purpose adjustments to tune a circuit to a desired result. The first question is then, what is the essence of the patent. A patent is limited to the invention described in the claims approved read in light of the specifications. Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 [1917]. The Eighth Circuit has further stated that:

"[A] patent is not a mathematical measurement. It is a *conception* reached by consideration of the combined effect of the state of the art, the contributions as revealed in the language of the patent to one skilled in the art, and any limitations imposed and accepted during the progress of the application through the Patent Office." General Motors Corp. v. Kesling, 164 F.2d 824, 832 [8th Cir. 1947].

It is helpful in order to fully understand the scope of the patent as well as its validity to state the factors which distinguish each claim from the others. Claims 1, 2, 14 and 15 all contain basic elements of a potentiometer. They all contain a housing member having two opposite, substantially flat sides, a resistance element, conductor [claim 1 only], a slider, a screw to move the slider with spring contact members on the slider and a means for making an external connection [Claims 1 and 2] through a side or end of the housing or an opening extending transversely through the housing to receive a mounting post.

Claim 11 is similar to the above claims except that there is no housing stated and there is added "a pair of upstanding portions at opposite ends thereof." It also contains a "means engaging said screw means to prevent longitudinal movement thereof while permitting rotation thereof"; also a "means restraining the slider against rotation."

Claim 20 has the basic elements found in 1, 2, 14, and 15 but adds to that, without mention of mounting holes, that the resistor is capable of being "adapted to be assembled in juxtaposition with other like resistors." This description presumably explains the size, configuration and ability of the devices to be stacked or mounted easily either alongside or on top of each other.

Claim 16, while also similar, includes language that the cover cooperated with the housing to form a conduit in one side of the housing.

Throughout all except claims 16 and 20 reference is made, in addition to or in conjunction with what has been already stated, to the mounting holes or openings which generally extend transversely through said housing perpendicular to the flat sides and is used to receive a mounting post in order to permit close and rapid assembly. Claims 1 and 2 are somewhat different in language in that there are holes both perpendicular and parallel to the flat side portions still having the same purpose of close and rapid assembly.

Commencing with the history and progress of this application through the patent office as finally embodied in claims 1, 2, 11, 14, 15, 16 and 20, it provides some insight into the scope of the patent. Bourns initially submitted eighteen [18] claims all of which were rejected. The Patent Examiner in so ruling relied primarily upon and cited patent number 2,357,433 [the Side Patent] stating that the Bourns '926 patent was unpatentable over the prior art. Of the original eighteen [18] claims Bourns amended two [originally claims 2 and 3 and now claims 1 and 2]. These claims were amended to include mounting holes which were placed on adjoining sides to permit close and rapid assembly with other variable resistors. Also additional claim 22 [present claim 11] was submitted without any provision for mounting holes. Claims 2 and 3 were accepted [becoming claims 1 and 2] and original claim 22 was amended to include the mounting holes. Also, new claims 29, 30, 31 and 38 which subsequently became 14, 15, 16 and 20 respectively were also submitted. Claims 29 and 30 included mounting holes but were different to the extent that not only was there an opening but that opening extended completely through the housing enabling the receipt of a mounting post. Original claims 22, 29 and 30 were accepted and became 11, 14 and 15. Claims 31 and 38 were rejected. Claim 31 [now claim 16] was then amended to include a housing and its cover which formed a conduit on one side of the housing. After the amendment that claim was also accepted. Claim 38 was also amended. It read closely upon the Anderson and Dietrich patents [see file wrapper of '926 patent] and after minor wording changes was also accepted. It originally contained functional language pertaining to the mounting holes.

From a reading of the allowed claims and the history of the patent as it passed through the patent office it seems apparent that the mounting holes are the elements [excepting claim 16] of the patent which the Patent Examiner believed to be the essential feature which made the patent acceptable. The patent office cited the Side Patent as containing all of the elements of the Bourns '926 patent until the amendment to include the mounting holes or a rearrangement of the parts to allow an opening extending completely through the housing. Whether the Patent Examiner believed the mounting holes themselves to be unique or because of the arrangement of the components of this specific device to allow room for the mounting holes it is not necessary to decide. This Court believes both interpretations require a decision rendering the patent invalid.

■ Even if the history of the patent's progress would not be sufficient to show that the essence was principally a rearrangement of components of a device, not in itself patentable, which would allow for ease and flexibility in mounting, the statements of the inventor himself should further show beyond doubt that the device was not patentable. An inventor's own appraisal of what he considers to be the nature of the patent is of prime importance and is to be given great weight. Goodwin v. Borg-Warner, 157 F.2d 267, 269 [6th Cir. 1946]. See also Deller's Walker on Patents 2d ed., Vol. 4, § 228 [Baker, Voorhis 1965]. The inventor, Mr. Bourns, stated during the course of the trial that, after returning from a business trip, where there were some objections to the means of mounting the device, he caused the device's components to be rearranged in order to allow for the mounting holes passing completely through the housing without altering the overall size. He further states, later in the record, that the essence of his invention and his contribution to the art was in "taking all these incompatible parts and changing their size and proportion and bringing them together in a single embodiment" [Record pp. 138, 139].

A further remark should be made regarding the language of the patent claims and the history of the patent. Plaintiff has claimed that there are additional advantages or attributes to the LSAP. He claims self-locking adjustment, immunity from shock, and ease of adjustment combined with its miniaturization in order to conserve space. While these may be attributes they are not included in the claims. This situation is thus similar to that found in National Connector Corp. v. Malco Mfg. Co., 392 F.2d 766, 769 [8th Cir. 1968] where the Court said that while such factors may be asserted to be attributes they are outside of the specific claims of the patent itself. The Circuit Court there stated that the scope of the patent must rest upon the claims as stated and accepted by the patent office. Even though it may

have other inherent attributes, they are not within the scope of the Patent. It should also be stated that Malco recognized that the use of "subtests", such as are here concededly present [great commercial success and a need for such a device in the trade] are not persuasive "if prior art anticipates or otherwise makes obvious the attributes of the improvement involved". National Connector Corp. v. Malco Co., supra, at page 769.

Once having discussed the language of the claims, and the evidence relating to the scope and essence of the patent as adduced from the history of its passage through the patent office, it now becomes necessary to pass to another area for consideration, namely, the state of the prior art at the time of the claimed invention.

The evidence and facts below presented which relate to the prior art have been considered to determine if there is any reasonable construction which may be given to the patent claims which would allow the Court to declare it valid. The prior art is also considered to limit the scope of a patent if there are some grounds for declaring it valid.

Defendant has presented numerous patents in addition to those cited by the patent examiner. In themselves the patents cited by the Examiner are persuasive as to what the limits of the '926 patent should be. However, with the limits defined, as deduced from the patent application, then defendant's presentation of numerous additional patents, which read on the patent as defined and which have not been cited by the Patent Office, considerably weakens if not dissolves the presumption of validity.

*Bourns Model 115 CT.*

As testified by plaintiff's witness, Mr. Hardison the Bourns 115 CT potentiometer was basically the same as the '926 patent [mounting holes excluded for the present] with the exception of the push-pull rod type of mechanism rather than the leadscrew. This difference did provide, in the '926, greater measurement

accuracy and resistance to vibration. However, even though plaintiff's device shows greater ability to exact fine measurements and resistance to vibration these are not factors contained in the claims and cannot therefore be considered as part of patent to be protected.

*The Kiefaber Patent.*

This patent would seem to fill any gap in the state of the art because of the presence of the leadscrew rather than a push-pull rod. Mr. Hardison testified that the leadscrew in the Kiefaber patent had essentially the same purpose as the leadscrew in the '926 patent. In addition, this patent contained many of the elements contained in the '926 patent, namely, a base member, conductor, resistance element, screw means to prevent longitudinal movement, slider having threaded engagement with the screw, spring contact members on slider for wiping resistance element, means for restraining the slider against rotation and where the turning of the screw causes spring contact members to travel over said resistance element and conductor. This patent then, with the exception of the mounting holes and possibly the size of the device, reads extremely close to the '926 patent.

Defendant has also entered in evidence the claims and characteristics of many other patents. The Thompson patent has similarities in that it has a housing resistance element, slider with spring contact members and a means for making external connections. This patent as well as those above cited and the many also presented bear a sufficient resemblance in purpose and design that there is no room in the art for any interpretation of the claims of the '926 to sustain its validity unless it may be found in the reorganization of the components or in the mounting holes. The mounting holes would seem to be the only gap in the art where a nonobvious device could be held patentable.

Now, regarding these mounting holes, defendant has shown that the Bourns 115 CT device has single holes which are made to receive mounting posts and screws which would secure the device to another instrument. These holes, however, as defined, do not allow for an opening extending transversely through the housing which would then be capable of receiving a mounting post. The laboratory potentiometer entered as evidence to show similarity to the '926 has mounting holes which essentially amount to screwholes in the legs but this is a far cry from a hole passing entirely through the device and thus being capable of receiving mounting posts. The prior art here presented does not evidence that type of mounting hole passing entirely through the device. This is the case in some of the claims of the '926 patent.

Thus reviewing the limitations resulting from the amendments to applications made to the patent office after previous rejections of claims, together with an interpretation of the language in the claims as stated by persons skilled in the art as they relate to the wealth of prior art in the field, it is clear that the '926 patent in order to be valid must be held to be specifically and narrowly defined and limited by the claims. As stated, the evidence revealed readings on the prior art which were recognized by the patent examiner which resulted in their initial rejection. Subsequent amendment of claims, in order to escape rejection, as earlier outlined, then resulted in a limitation by amendment. See Deller's Walker on Patents, 2d ed., Vol. 4, § 234 [Baker, Voorhis 1965]. The language of the claims reveals readings on the prior art in addition to that found by the patent examiner and if this patent is to be declared valid it must be narrow, so narrow as to be limited by the later amendments and the state of the prior art. This Court believes that, by the limitations evidenced in prior rejections and the interpretation by experts of the language as it relates to the prior art, fortified by the statement of the inventor of what he believed the essence of the patent to be, the patent to be valid must rely upon its size or composition which allowed for rapid mounting with ease of

adjustment and in some of the claims on ability of the device to be mounted in close proximity to others. The language of the claims which calls for a hole passing tranversely through the housing is related to size and composition. It is nothing more than a rearrangement to allow a pole to pass through. In itself it cannot be claimed that a hole for mounting without some other difficulty or definition is sufficient to rise to the dignity of a patent. The above remarks relate to all of the claims except 16 which is to be treated separately.

 Once having reached a conceptual rather than a mathematical formula type understanding of the nature of the patent, if we were to apply the test for obviousness as laid down by the Eighth Circuit in the *Malco decision*, assuming, as in that case, novelty and utility were established this patent could not be declared valid. The "scope and content of the prior art," already indicated by the Thompson, Kiefaber and Bell as well as others, prevents any broad construction. If the claims are given a limited and narrow construction as earlier stated which this Court believes to be the true construction plaintiff is precluded from relying upon a difference in configuration to allow mounting holes extending completely through the device or by stating the purpose of this configuration to allow rapid assembly or the devices to be placed in juxtaposition with each other. "Changes of mere form, proportions or size will not sustain patentability." National Connector Corp. v. Malco Mfg. Co., 392 F.2d 766 [8th Cir. 1967); Gerner v. Moog Industries, Inc., 383 F.2d 56 [8th Cir. 1967].

In regard to claim 16, it was continuously rejected by the patent office until the language of the claim was amended to include that a cover for the device cooperated with the housing to form a conduit in one side of the housing. Until this change the language is essentially the same as that of the other claims less reference to mounting holes. In light of this history, this Court finds it hard to believe that the laying of wires in an open slot or their passing through a hole is such a unique design as to rise to the dignity of a patent. This writer would have to agree with the expert witness that the advantages of this aspect would be apparent to one skilled in the art of fabricating such devices. There is therefore no validity to claim 16 and the '926 patent is held to be invalid.

### The 3,161,849 Patent.

 Originally plaintiff based its action upon claims 12, 15, 16 and 17 of the '849 patent. After trial plaintiff, in view of the trial testimony, concedes claims 15, 16 and 17 are not patentable after disclosure of the Bourns Patent #2,935,716. The only claim remaining therefore upon which to uphold the validity of the patent is claim 12.

Defendant's thrust at this claim of the patent also centers on its invalidity. Defendant's attack is fourfold. It claims obviousness in light of previous similar patents; prior use by virtue of testimony of a Mr. Elliot who allegedly manufactured and sold similar instruments prior to the conception of the '849 patent; admissions of invalidity of claims 15, 16 and 17 should also be applied to claim 12, and finally laches.

After a review of the evidence which shows the similarities between the '849 patent and all of the prior patents and the devices allegedly manufactured and put into circulation prior to the '849 patent, the validity of this patent hinges upon certain language in the Second Means of claim 12. It reads: "A terminal device comprised in said terminal means being constructed and arranged as a bearing to rotatably support the first end of said leadscrew and serving to conduct electrical current conducted by the leadscrew." It is the plaintiff's apparent claim that this is the factor which distinguishes his device from the prior art, that is, the performance of a double function of rotatable support and conducting electricity by the terminal means. Without an undue detailed statement of the evidence it is sufficient to state that the state of the prior art and

the statements of individuals experienced in the field as to what would be obvious to someone knowledgeable in the field demonstrates striking similarities with the patent here claimed. The Semple and Kiefaber Patents, as explained by experts in the field together with designs and expert's explanations of devices, conceptualized and reduced to writings and drawings prior to any conception of this patent, compel the holding of the '849 patent as invalid.

There are Three Means which make up claim 12 but the First and Third Means contain nothing more than the standard elements of a leadscrew adjusted potentiometer and thus based upon findings as to this patent and the '926 do not distinguish the devices there explained from the prior art. Discussion is therefore limited to the Second Means of claim 12.

Defendant claims that when plaintiff declares claims 15, 16 and 17 to be invalid they then enter into the public domain. Once they have entered it is his contention that nothing remains of claim 12 which is not contained in 15, 16 and 17 and is therefore invalid. The Court does not believe that this contention in itself is sufficient to render claim 12 invalid. A reading of the language of 15, 16 and 17 does not reveal the claim of a double function of the terminal device mentioned in claim 12. The Court does note however and as was noted by the Seventh Circuit Court of Appeals in Hoover Company v. Mitchell Manufacturing Company, 269 F.2d 795, 803 [1959] that "this is another circumstance which detracts from the contention relative to the meticulous care which was exercised in the Patent Office" and that therefore it will effect the presumption of validity.

■ The next of defendant's contentions relates to anticipation as found in 35 U.S.C.A. § 102 [a]. Again it is apparent at the outset that there is a heavy burden upon the party attempting to establish prior use. FMC Corp. v. F. E. Myers & Bro. Co., 384 F.2d 4, 10 [6th Cir. 1967]. In light of the publications

with accompanying design charts and the testimony of the producer and other experts in the field the record is clear and the burden has been met.

The claim of a prior use centers upon two potentiometers produced by a Mr. Elliot while associated with California based Wellan Corporation. Plaintiff admits conception and first drawing of its patent to be about February 1st, 1956. Defendant claims prior use during 1954 and 1955. The two potentiometers upon which this contention centers are described in the record as Exhibits A-78 and A-81. Plaintiff contends that while the drawings of the construction of A-78 device are sufficient to show the similarities of construction detail there is not sufficient evidence to meet the burden of proving prior manufacture and sale. The contentions regarding the A-81 device are just the opposite. Plaintiff does not contest ample evidence of prior use but contends that the evidence of construction similarity is not sufficient to meet the burden.

The evidence relating to the construction of the A-81 design centers upon freehand drawings by Mr. Elliot made from memory just prior to the trial. He also had available detailed sketches of the A-78 design which contained basic similarities but to which were added certain improvements then embodied into the A-81. This Court determines that the testimony of Mr. Elliot and his memory sketches are sufficient to meet the burden of proving anticipation prior to the conception of the Bourns '849 patent. The evidence relating to the construction of the A-78 design is likewise sufficient. Both devices contain the basic potentiometer equipment, are sealed against humidity etc., have a "hot leadscrew" and have a terminal device which both rotatably supports the leadscrew and serves to conduct current from the leadscrew. Regarding the prior use of these devices no question arises as to the A-81 as the plaintiff concedes, and the evidence amply supports, its prior use. Plaintiff contests, however, the prior use of the A-78. Mr. Elliot testified that

there were limited sales of the A–78 prior to the A–81, he states that they were sold to at least four companies and that numerous samples were distributed. He states, with no evidence to the contrary, that it was the practice in the business to distribute some samples in order to generate interest in the product. Mr. Elliot further testified that he revealed the components and a description of the A–78 to a Mr. Butler prior to 1956. Mr. Butler testified as to the time of a disclosure but could not specifically confirm or deny the exact potentiometer or its exact components other than that they were similar. The Court believes however that Mr. Elliot's statements of prior sale and his statements regarding the disclosures to Butler confirmed generally by Butler establish prior use even though records of sale were unable to be produced.

Defendant has also claimed that the state of the art prior to the '849 patent establishes obviousness. As earlier stated the Kiefaber patent and the Semple patent, together with the testimony from Mr. Hardison relating to these patents and testimony from Mr. Carter as to what equipment or elements of a potentiometer would have been obvious to one engaged in that business, establish defendant's contention.

Plaintiff's defense to this claim also centers around the language previously stated from the Second Means of claim 12 pertaining to the terminal device having a double function. The remaining features of the '849 patent are all obvious in light of the prior art evidence. See Mr. Hardison's testimony concerning the Kiefaber patent [R. pp. 356–58] and Semple patent drawings [A–170 to 186]. Regarding the double function terminal, Mr. Hardison specifically testified that Kiefaber performed both functions. Any claim as to reduction in size and configuration is without merit as previously discussed in regard to the '926 patent. Additionally, it may be seen from examining the drawings of the Elliot designs that those terminals accomplish both functions. The one fac-

tor not previously discussed is the reference to a sealed and insulated housing. This is present in the Semple patent. Additionally, Mr. Carter testified that it would be obvious to a designer in the field to enclose the device to protect it from foreign matter and therefore prior art. Accordingly and without reaching the issue of laches the '849 patent is held to be invalid for either one or both of the above contentions.

### The 2,953,763 Patent.

Only one claim [claim 6] is in issue under the '763 patent. The claim states an improvement upon the basic '926 patent and involves the prevention of "end play" coupled with a more rapid assembly process for these precision potentiometers. By the use of the bowed spring with a "U" shaped notch there is a bearing or tension placed upon the leadscrew which holds it firmly in place as well as allowing, after preassembly of the leadscrew and wiper, easier and more rapid assembly by workers on the assembly line. Defendant claims the patent to be invalid because of the prior art.

The Court believes that defendant's presentation of prior patents which have similar functioning as explained by the experts is dispositive of the issue of invalidity in its favor.

Prior to the putting into practice of the '763 patent there were devices in the potentiometer field and somewhat related fields [to be discussed] which had for a purpose, although not their sole purpose, the placing of tension or pressure upon a shaft or leadscrew to prevent movement or vibration. See "O" Ring used by Wellan Corporation [previously discussed and held to be prior art in conjunction with the '849 patent] and Fay patent 2,717,983.

Regarding the Fay patent the plaintiff does not seriously contest the similarities between it and claim 6 of the '763 patent. A study of defendant's exhibit A 192–10 [fig. 2] and a reading of the Fay specification reveals a "U" shaped clip and a purpose of bringing tension

upon the shaft in order to reduce "end play." There are still however certain questions remaining to be answered. Does the Fay patent also cover the advantage of rapid assembly? Would it be obvious to substitute the "U" shaped clip in a potentiometer when the Fay patent is from a different although related electronic field?

Mr. Carter, defendant's expert, testified that it would be obvious to transfer the Fay "U" shape to an Oler patented device which was in the potentiometer field and further stated that it would be obvious in the situation where the desired effect was a speed up in assembly to substitute the Fay function. This testimony was substantially uncontradicted. It was pointed out however that while the Oler patent's function would appear and was stated to have brought tension upon the shaft or leadscrew it did not. It was however, still a device in the potentiometer field. Mr. Carter's testimony therefore illustrates that the transfer of a function from the similar field in which the Fay patent is found to the potentiometer would be obvious in that it would speed up assembly and place tension on a leadscrew or shaft to reduce motion and vibration.

Regarding the Wellan Corporation patent, as found in exhibit A-78 testimony was received that the "O" type ring, in addition to providing a seal from foreign substance, also acted to prevent movement of the leadscrew. While this patent then has the capacity to prevent vibration it could not be rapidly assembled. Were this patent then relied upon to solely represent the art prior to the '763 patent the '763 patent would be left with the changing of what was before an enclosed "O" Ring to an open "U" ring so that it can be more easily assembled. Mr. Elliot, former Vice President of both Wellan and Dale, testified [A-349 pp. 49-55] by way of deposition that there are many instances of "U" shaped springs used on shafts. His deposition would indicate this to be a common design practice and should a person desire to place the spring later in the assembly that the open "U" would be the more common and practical design. The change, therefore, as the Court understands the facts, is that the "U" shape is common design not requiring any great expertise or great transition from the "O" Ring. Indeed even the "O" Ring itself is no great mechanical achievement. Mr. Elliot compares the spring tension strip pressing against the housing as a rather common practice similar to springs found in automobiles and chairs to prevent movement and vibration.

The Court therefore finds that the '763 patent is obvious under 35 U.S.C.A. § 103, even in light of the presumption against invalidity, when compared with the prior art as found in the Fay patent and when it is found that it would be obvious to one skilled in the art to transfer the function of the "U" shaped clip of that patent to a device like the '763 in the potentiometer field. The test for transition from one field to another seems to be whether the prior art relied upon is so remote as to require invention to make the necessary substitution or whether the investigators would naturally have looked to the field of the Fay patent for help. In re Shapleigh, 248 F.2d 96, 45 CCPA 705 [1957]; General Metals Co. v. S. K. Wellman Co., 157 F.2d 505 [6th Cir. 1946]; In re Schneider, 47 F.2d 970 [C.C.P.A.1931]. Even without Mr. Carter's testimony it would seem obvious to the Court to search a related electronics field for a device to control vibration and speed of assembly. It is not the type of a function which would be peculiar to a particular type of instrument but rather one that would be used in a variety of instruments all having the desired effect of controlling vibration. Mr. Elliot's statements of the basics of the principle involved also support this belief.

The Court also finds, separated from the Fay patent, that the Wellan patent as found in A-78 has the characteristics of vibration prevention as found in the '763 patent and at an earlier date than the '763 [as discussed with the '849 pat-

ent] and that the cutting out of a slot in the "O" Ring to form a "U" and thus provide ease of assembly is not so nonobvious as to be patentable. The "O" Ring itself is not even nonobvious. [See again Elliot dep. Ex. A–349 [pp. 49–55]. Under the principles as enunciated in *Malco* either the prior art of Fay or Wellan coupled with the non-inventiveness of a strip spring open at one end because it would be obvious to one skilled in the art require this Court to hold the patent invalid.

*Patent # 2,898,569.*

 Claim number three is the only claim in issue under this patent. At the outset the Court holds that the patent is invalid. The prior art totally reads on the claim. Defendant's argument relating to prior art centers upon a Bourns patent # 2,860,217. Plaintiff does not attack the fact that the '217 and '569 patents have elements that do substantially the same work in substantially the same way as required by 35 U.S.C.A. § 102. In order that there be no doubt this Court holds that they do have elements that do substantially the same work in substantially the same way. The Court would place particular emphasis on the similarities of a plastic slider block of a resilient material which is self-threading or capable of being self-threading and which rotates around the leadscrew.

What plaintiff does contend, however, is that the '217 patent is not prior art. Again, as this Court understands the rules of priority governing patents it holds that the '217 patent is prior art. The matter revolves around the dates of conception and reduction to practice of the respective patents. The essential facts as found in the evidence show that Mr. Royce, the inventor of the '569 patent, started work on the invention in December of 1955; that the date of conception was claimed as mid-1956 at the earliest; and that it was reduced to practice at the earliest in the spring or summer of 1957. Regarding the '217 patent the only date here important is November 19, 1956, which is the filing date of that patent.

 It is the rule that the filing of an application with the patent office is constructive reduction to practice. Deller's Walker on Patents, 2d ed. Vol. 1 § 47 [Baker, Voorhis 1964]. The '217 patent was therefore, at the latest, reduced to practice on November 19, 1956. Defendant admits that the '569 patent was not reduced to practice until the spring or summer of 1957. Were reduction to practice to be the sole test of what constitutes prior art the '217 patent would then obviously be prior. The fact that the inventor of the '569 patent had no personal knowledge of the anticipating matter when his patent was reduced to practice is immaterial. He is presumed to know the prior art even if he had no actual knowledge. Deller's Walker On Patents, 2d ed., Vol. 1 § 73 [Baker, Voorhis, 1964].

The first to reduce to practice is not, however, always the first inventor.

"A first conceiver must use reasonable diligence in reducing his idea to practice in order to entitle him to a patent as against a subsequent conceiver who has first reduced his invention to practice. If the first inventor of a device exercises reasonable diligence in reducing it to practice, he does not lose his right to a patent because a second and independent inventor of the same device may have first put it into actual use. The man who first reduces an invention to practice is *prima facie* the first inventor. However, the inventor who first conceives an invention will be considered the first inventor if he uses diligence in reducing his invention to practice. If a rival inventor enters the field, then the first conceiver must use diligence before, as well as after, the conception of the invention by the second inventor." Deller's Walker on Patents 2d ed. Vol. 1, § 51 pp. 221–22 [Baker, Voorhis 1964].

 Initially the writer notes also that if the burden is upon the plain-

tiff to prove diligence from conception he should also have the burden of showing the date of conception. See Helene Curtis Industries v. Sales Affiliates, 233 F.2d 148, 156 [2d Cir.] cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed.2d 80 [1956]; United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 77 F.2d 263, 264 [2d Cir. 1935]. Conception is generally defined as the formation in the inventor's mind of the complete operative invention or as the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice. Knowles v. Tibbetts, 347 F.2d 591, 593, 52 CCPA 1800 [1965]; R. C. A. v. Philco Corp., 201 F.Supp. 135, 149 [E.D.Pa.1961]. As defendant has pointed out and this Court states, the plaintiff has not carried its burden of proof regarding the date of conception of the '569 patent. Plaintiff states the date to be mid-1956 but the evidence for that statement is exhibit A–58B dated July 6, 1958. That exhibit does not reveal the sophisticated characteristics claimed in the patent. The Court finds no other evidence sufficient to indicate conception of the '569 patent prior to the constructive reduction to practice of the '217 patent on November 19, 1956. Furthermore even if the '569 was conceived first it is still incumbent upon plaintiff to show reasonable diligence in reducing his idea to practice. He admits conception not earlier than mid-1956 but further admits the lapse of approximately a year before the device was reduced to practice. This burden of showing reasonable diligence also has not been met. No reasonable excuse for the delay has been shown nor is any evident. It does not seem to be unreasonable in this potentiometer field that a time considerably shorter than one year would be sufficient to reduce the instrument to practice. Over and above that the patent application was not filed for another six months after that. Any attempt to show a date of reduction to practice prior to the filing date is also a heavy burden which plaintiff has neglected. See Ritter v. Rohm & Haas Co., 271 F.Supp. 313 [S.D.N.Y.1967].

The evidence therefore supports the conclusions that the '217 patent was first reduced to practice and plaintiff has failed to meet its burden of showing first conception and reasonable diligence in reducing to practice. The writer also states that a year is, under the circumstances of this case and the field in which this device is found, an unreasonable delay in reduction to practice. The Court would only further add that the patent office made no reference to the '217 patent when allowing the '569 patent and that this fact coupled with any of the above conclusions is more than sufficient to overcome the presumption of validity attached to patent office grants of patents.

Defendant has raised other arguments concerning the validity of this patent and also that it, if it were to be declared valid has not infringed. As has been previously stated it is important to determine the scope and essence of the patent. The only claim in issue reads as follows:

"In a construction including a movable member positioned upon a threaded shaft so that as said shaft is turned, said movable member is caused to move along the length thereof by the threads of the shaft, the improvement which comprises: a movable member of non-conductive material having sufficient resilience so as to undergo temporary deformation when in pressure contact with the threads of said shaft, said movable member being formed with an elongated opening of uniform cross-sectional configuration to receive said shaft, said opening being formed so as to extend entirely around said shaft, said opening being formed so that at least a part of said movable member is engaged by said shaft and deformed thereby, the resilient material of said member being displaced between the threads of said shaft down into the space between the crests and valleys of said threads."

Plaintiff has not seriously claimed that there is anything rising to the dignity of a patent as a result of this claim except that the slider block, made of a resilient material, has certain qualities not before present in the field which would lengthen the life of the instrument. Essentially plaintiff claims that this slider, when it reaches a point when it cannot move forward any further along the axis of the leadscrew, but the leadscrew itself continues to turn, will, when the leadscrew reverses direction either form new grooves in the block or jump back to the previous grooves. Thus the material of the slider block would allow the potentiometer to function after ratcheting has occurred.

While it is not exactly clear whether the use of these materials actually allows the functioning of the device to continue it is clear that the flexibility and relative softness of the material is the reason for any possibly functional continuation of the device. When comparing the plastic or nylon material to steel blocks or units through which steel screws turn it is easy to see that once the grooves of those types of nuts are stripped there is no possibility of future operation of the device as is true with a resilient material.

If plaintiff's discovery works as he claims then the only real discovery is use after ratcheting in potentiometers. The use of an elastically deformable material is not new to this general field. When processing the '569 patent the patent office recognized the

> "use of a member formed of an elastically deformable material engageable by the threads of a leadscrew so as to take an impression of the threads whereby rotation of the leadscrew causes the member to move lengthwise." [See Ex A–282 p. 15 citing the Wallin and Gotschall patents].

There is no new product possessing any greater resiliency. The patent description states only generally the types of material and prior art indicates the use of these materials in many fields where a screw device is inserted into a solid or pre-formed resilient block but the difference which plaintiff claims is that these prior devices never had to cope with the problem of functioning after ratcheting or at least that it was not revealed in these prior patents [excluding the '217 patent previously discussed]. This Court is thus faced with the question of whether or not it would have been obvious to one skilled in the art to use a resilient material as described in the '569 patent to prevent a malfunction after the block cannot move any further but the leadscrew still continues to turn? It is essentially an additional claimed advantage for an old product. Because of the flexibility of the product it may function even after the grooves of the block have been at least partially stripped.

In addition to the patents cited by the patent examiner defendant has presented an additional patent in the potentiometer field [See Zupa patent # 2,802,503, exhibit A–193–20] and others where the similar basic principle of inserting a screw into a resilient block is utilized [See exhibits A–193–12, 15 and 16]. While these instruments in the prior art do not necessarily state the ratcheting effect or even utilize it they show the similar principle behind ratcheting. Because the material is flexible ratcheting may occur and the device may still continue to function. These patents show the use of the resilient material precisely because it is soft and will allow the screw to move through and make its own grooves thereby being self-threading. Merely because plaintiff's claimed use continues to make new grooves or is flexible enough to continue to give under added pressure does not so distinguish his use that it is not, in the belief of this Court, obvious to one skilled in the art. The material is the same. The principle still is the same in allowing additional grooves because of the relative softness of the material. What plaintiff is claiming therefore is merely the making of more grooves after the block can no longer move forward and

then additional grooves may be made when the rotation of the leadscrew is reversed. The Court should only further note, in order to be perfectly clear, that the claim of a continuous function after ratcheting is sufficiently rebutted in order to overcome any presumption arising from the '569 patent processing through the patent office.

There is one further point which should be discussed. As has been previously stated plaintiff's only claimed invention is functioning after ratcheting. And also, as has been previously stated, there is no other characteristics present which would allow the declaring of a patent valid. What bothers the Court is that it does not believe that claim 3 can be construed to include this claimed essence of the patent. There is no statement of this ability to function in this manner after the block runs up against one end of the instrument body or its ability to function after reversing the rotation of the leadscrew. If this is the real essence of the patent why is it not stated in the claim? Furthermore, as also has been previously stated, if the ability to function after ratcheting is the real essence of the patent that ability is merely an extension of the principle of using elastically deformable material. The patent office specifically refused to allow certain claims because they read on other patents using an elastically deformable material. Under the teaching of the *Malco* case, supra, the process of the patent through the patent office should be considered. Here anything based upon elastically deformable material could not be read into the claim. That consideration coupled with absolutely no statement of the effect which plaintiff claims is the crux of his patent would strike the mind as an afterthought and was not intended by either the patent office or the inventor to be stated as part of the claim. Nothing else being novel or not being present in the prior art the patent is also invalid for that reason.

The Bourns '569 patent is therefore invalid for any of the above reasons.

## The '716 Patent.

This patent is an improvement patent on the basic LSAP. Only one claim, number two, is in issue. The essential elements of this claim, the patent being commonly referred to as the "mating halves" patent, are two housing members which cooperate together to journal the leadscrew therebetween. Plaintiffs state that in the original design, which was the '926 patent previously discussed, the leadscrew had to be inserted through a hole in the housing, then fed through the slider and finally into a bearing hole in the opposite end. It now argues that by being able to drop a pre-assembled shaft and slider in from the top there is a speed up and vast improvement in the manufacturing process. It also claims that, whereas before undesirable end-play, unnecessary movement, or rattling was difficult to control, the cooperation of the housing and cover reduces end-play without the maintenance of a close dimensional tolerance. The critical words of claim 2 thus are:

> "cooperating means on said housing engaging said shoulder means to prevent endwise movement of said leadscrew, said other housing member engaging said shaft to confine the same in place within said notch."

The patent here in question is allegedly either a divisional or a continuation-in-part patent which would entitle it to the filing date of the parent application which would be May 3rd, 1954. If plaintiff is not entitled to this early filing date then there seems to be little question but that the patent would have to be declared invalid. Defendant claims that the patent is not entitled to the early filing date because of plaintiff's execution of a false oath; because there are substantial additions to the divisional application not found in the parent application; and because the state of the prior art, namely the Bourns '926 patent, discloses clearly, even though accidentally, the invention here claimed.

As earlier stated, if this patent would not be allowed to be classified as a divi-

sional or continuation patent thereby allowing a filing date of May 3rd, 1954, the patent must be held invalid. Defendant has shown sale of their Dale Type I units in the summer of 1956 which the evidence shows to read upon the claim in question and plaintiff has admitted sales of the infringed patent in the summer of 1954. If the November 1957 filing date is the record filing date then the patent is invalid under 35 U.S.C.A. § 102[b] because of sales and use more than one year prior to the record filing date of the parent application having been proved.

The first question then is whether plaintiff's filing of an incorrect statement or oath at the time of the filing of the divisional application is a deficiency which would prevent the patent from being held valid. What actually occurred is that plaintiff filed the oath normally filed with an original rather than a divisional application which stated the invention was not in use or on sale more than one year prior to the filing of that application. The record is clearly to the contrary. As previously discussed there were sales prior to November of 1957, the actual filing date of this patent application.

There is some authority for the proposition that where there is an amendment to the original application and the subject matter of the added claim is not substantially embraced in the original application the absence of an oath accompanying the amendment is fatal to the patent. George Cutter Co. v. Metropolitan Electric Mfg. Co., 275 F. 158, 162 [2d Cir. 1921]; Balaban v. Polyfoto Corp., 47 F.Supp. 472 [D.Del.1942]. The situation here, however, is somewhat different. It is true that the plaintiff filed the wrong form of oath and represented no use or sales more than one year prior to his divisional application but in the same application stated that this was a divisional application arising out of a parent application three years earlier and having the heretofore mentioned filing date of May 3, 1954. It would therefore be reasonable to assume that

the filing of the wrong form was a clerical mistake for which the penalty of declaring the patent invalid should not be utilized. It is not necessary that an application verify that there was no use or sales more than one year prior to the filing of the divisional application but only that there was no sale or use more than one year prior to the filing of the parent application. This latter statement would be the reasonable interpretation of what the applicant meant to say and could reasonably be interpreted in that manner by the patent office in light of the statement that it was a divisional application. In those cases holding the failure to file the supplemental oath it was necessary that there be filed an oath stating that there was no sale or use more than one year prior to the filing of the amendments to the original application. Without some intentional misrepresentation evidenced plus the statement that it was a divisional application in the patent description the Court believes that this technical error is not fatal to the validity of the patent.

Defendant's second claim of invalidity is based upon the argument that substantial additions to the divisional applications were made. It believes that the Patent Office Rules And Practice § 147.2 and § 147.3 require that the subject matter of a divisional application be carved out of the original or parent patent. Defendant first claims that there are substantial changes between the wording of the final allowed parent patent and the final allowed divisional patent. It also claims substantial differences in the figure four in each of the patents.

The Court does not believe that wording substitution or changes is the appropriate test. It should be whether the design is substantially embraced in the statements of invention or claims of the earlier patent *application*, not, as defendant cites, the *final allowed patent description, specification and claims.* The final claims and specifications as allowed, while they may reveal the divisional claim, do not reveal the divisional

claim nearly as succinctly as the original application for a patent prior to the patent office requirement that an election be made. At that point it can be determined whether the divisional claim was revealed in the parent application. Whether or not the statement of invention there revealed in the parent application would anticipate the divisional claim would be an appropriate test. Walsko v. Smith, 102 F.2d 815 [CCPA 1939]. If the invention later claimed in the divisional patent is substantially carved out of the parent, regardless of word changes, then it is entitled to the parent filing date. Coltman v. Colgate-Palmolive-Peet Co., 104 F.2d 508 [7th Cir. 1939].

> "[T]he original application is the mother or parent application, and all claiming to be her offspring must show bloodstream connection with her. Unfortunately, the proof of the exact invention is not always clearly disclosed by the words used. When the solicitor's vocabulary is full to overflowing and words of both elastic and comprehensive meaning are chosen, it is difficult to lay down or apply a rule or a test by which it may be confidently said * * * the application and claims of a divisional patent, are for 'the same invention' or * * * conform to the original application." 104 F.2d at 515.

Realizing the difficulty, this Court determines that the invention claimed in the divisional application is substantially embraced in the statement of invention, specification, description and claims of the parent application. A review of the file wrapper of the parent application [Ex A–283] reveals that on May 31, 1957 the patent office decided that a restriction was required. Subsequently the applicant made an election. The letter informing the applicant of the restriction divided the then existing claims into six groups. Group five was elected by the plaintiff. Group one, which then comprised claims 20, 35, 36 and 38, contained, at that time, similar language to the critical language of claim 2 of the '716 patent here in question. Claim 36

has almost identical language to the claim 2 of the '716 patent. Claims 20, 35 and 38 contain language that would embrace a design substantially similar to that as stated in claim 35 at least as far as the critical language previously mentioned. So that there be no doubt and in order that an issue not raised in the briefs will not later arise, namely the need for a supplemental oath with any amendment, there is also language in the original claims filed in May of 1954 that will allow the subsequent amendments here cited to substantially embrace the original application even though those claims were originally rejected for indefiniteness. See file wrapper for the '949 patent, original claims 7, 8, 14. The Court also states that the drawings as originally filed in 1954 have not been altered appreciably, contrary to defendant's argument. It argues that the figures four have been substantially changed. Any changes that have been made appear to have been made at the patent offices request for more exact explanations which would then require some minor changes in the figures.

This Court therefore holds that any additions or variations between the parent and divisional application are not so substantial as to prevent the divisional application from utilizing the effective filing date of the parent application.

Defendant's final argument rests on the proposition that, even though the '716 patent is entitled to a May 3rd, 1954 filing date, claim 2 of the '716 reads directly on the structure shown in figure 17 of the Bourns '926 patent, which is in the prior art prior to the parent application filing date. There is no reference in the claims, descriptions or specification of the '926 to the structure allegedly disclosed in figure 17. Defendant's argument rests on the figure alone and a theory of accidental disclosure.

It has been held that it is immaterial whether the inventor realizes his disclosure. All that is necessary is the fact that a disclosure has been made. Deforest Radio Co. v. General

Electric Co., 283 U.S. 664, 51 S.Ct. 563, 75 L.Ed. 1334 [1931]. However, an accidental disclosure is only available as a prior reference if "clearly made in a drawing." Application of Seid, 161 F.2d 229, 34 CCPA 1039 [1947]. It is also the law that a drawing alone, if it teaches to the art what the patentee claims in his invention, is sufficient for anticipation. Des Rosiers v. Ford Motor Company, 143 F.2d 907 [1 Cir. 1944]; In re Boyd, 55 F.2d 493 [CCPA 1932]; In re Bager, 47 F.2d 951 [CCPA 1931]; Jockmus v. Leviton, 28 F.2d 812 [2d Cir. 1928].

Plaintiff's basis for validity is reduced to the statement that this Court is unable to determine from the evidence that the disclosure, for purposes of anticipation, in figure 17 of the '926 patent is *clearly made* within the meaning of those words as stated in earlier precedent. The disposal of this issue hinges upon a small area marked with an "X" in exhibit A–298. If this small piece above the leadscrew is clearly part of the cover and not intended to be part of the housing then the remainder of figure 17 clearly discloses the remaining elements necessary for anticipation. See the testimony of plaintiff's witness Hardison, record pp. 337–345.

Plaintiff relies on some statements by the defendant's witness Carter that "[i]t is not clear whether it is a part of the cover or not." [R. 498]. This is the only place the Court can find in the record some doubt as to whether this piece was a part of the cover. Even this was later clarified by Mr. Carter's statements that the piece as depicted would be as drawn in figure 17 if it was a separate piece but attached to the cover. Defendant, as to the remaining evidence successfully rebutted any argument that figure 4 and figure 17 of the '926 should have been drawn the same way [plaintiff claims a draftsman's error in figure 17] by showing numerous differences in design and structure between the two figures and a reasonable explanation to show figure 17 as drawn. Plaintiff claims the draftsman's error but there is

no evidence of mistake or even intent by the inventor it should be otherwise other than what may be inferred from other evidence and plaintiff has successfully rebutted any rational inferences that could be drawn. Furthermore, the cover is metal and so is the piece in question according to the patent office guidelines for drawing what is plastic and what is metal. There is no requirement in the claims that the cover be one solid piece and it is definite that it is not plastic as drawn as is the base housing member unless there was evidence of mistake. The Court therefore concludes that figure 17 of the '926 patent is clearly disclosed and anticipates claim 2 of the '716 patent.

This Memorandum shall constitute the Court's findings of facts and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

Counsel shall prepare an appropriate order and submit immediately.